MAX N. TOBIAS, JR., Judge.
|, The relator, Robert Jones, seeks review of the 24 January 2014 ruling that denied his application for post-conviction relief. We granted a writ of certiorari, ordered the record, briefing, and oral argument. For the reasons that follow, we grant Mr. Jones relief.
*784 /.
STATEMENT OF THE CASE
On 11 June 1992, the state obtained an indictment charging Robert Jones (“Robert” or “the relator”)[1] with one count of aggravated rape, one count of second degree kidnapping, one count of aggravated crime against nature, and three counts of armed robbery, all arising out of an incident that occurred on 6 April 1992.[2] On 12 March 1996, a jury found Robert guilty as charged on these six counts. The court subsequently sentenced Robert to life imprisonment without benefit of parole, probation, or suspension of sentence as to the rape conviction and twenty-five years at hard labor without benefits on each of the remaining counts, the sentences to run concurrently. On appeal, this court affirmed his convictions but |2vacated his crime against nature sentence, finding it to be illegally harsh. This court affirmed his remaining sentences and the Supreme Court denied the state’s application for review. State v. Jones, 96-2453, unpub. (La.App. 4 Cir. 12/10/97), 704 So.2d 994 (Table), writ denied, 98-0194 (La.5/15/98), 719 So.2d 460. On remand, the trial court resentenced Robert on the crime against nature count to serve fifteen years at hard labor without benefits.
In 2000, Robert filed his first application for post-conviction relief, which the trial court denied. This court denied Robert’s writ application from that ruling. State v. Jones, 00-0489, unpub. (La.App. 4 Cir. 3/21/00). Robert then filed various pleadings in the trial court concerning DNA testing of evidence. This court ordered a hearing in the matter in 2002. State v. Jones, 02-2159, unpub. (La.App. 4 Cir. 11/14/02).
In 2006, new counsel for Robert filed a second application for post-conviction relief, alleging newly-discovered evidence. The trial court denied the application in January 2008 and granted Robert an “appeal” from its ruling. On review, this court converted the “appeal” to an application for supervisory writ of review, granted the writ, and affirmed the trial court’s ruling; the Supreme Court denied review. State v. Jones, unpub. 08-0516 (La.App. 4 Cir. 2/11/09), 3 So.3d 92 (Table), writ denied, 09-1230 (La.1/29/10), 25 So.3d 830.
On 11 August 2010, new counsel for Robert filed his latest application for post-conviction relief. Without being ordered by the trial court, the state filed its procedural objections on 4 November 2010. The next day, defense counsel filed various pleadings, including a supplement to the post-conviction application. The | court held a hearing on the application on 14 December 2010, at the conclusion of which the court took the matter under advisement. The court denied the application without prejudice on 21 January 2011 on procedural grounds, reserving to Robert the right to re-urge his application if he was able to find trial counsel from his 1996 trial. This court denied Robert’s writ application from this ruling and the Supreme Court declined review. State v. Jones, 11-0241, unpub. (La.App. 4 Cir. 5/12/11), writ denied, 11-1223 (La.3/23/12), 84 So.3d 569.
Robert ultimately discovered his trial counsel’s whereabouts, and the court held a hearing on 17 December 2012, at which trial counsel, Curklin Atkins, testified. *785 Robert offered more evidence. On 22 February 2013, the court reversed its earlier ruling that had denied the post-conviction application on procedural grounds, and granted an evidentiary hearing on the merits. The state objected and sought relief, but this court denied the state’s writ application and once again the Supreme Court declined review of the matter. State v. Jones, 13-0338, unpub. (La.App. 4 Cir. 4/11/13), writ denied, 13-0584 (La.4/12/13), 111 So.3d 1021.
After the issuance of various subpoenas and subpoenas duces tecum, the court heard the matter on 26 September 2013 and 8 October 2013. On 24 January 2014, the court denied the application for post-conviction relief. Robert objected and this timely writ application ensued.

II.

FACTS
Robert was convicted in this case of crimes that arose out of an incident in the French Quarter that occurred on 6 April 1992: the aggravated rape, forcible l4kidnapping, aggravated crime against nature, and armed robbery of T.P.,[3] as well as the armed robberies of her husband, L.J., and her friend, H.T. Robert contends that he is innocent of the charges, blaming the crimes on Lester Jones (“Lester”). Within a month of the incident involved in this case, several other armed robberies and one murder (that of Julie Stott on 14 April 1992), also occurred in or near the French Quarter, and the same vehicle was identified as having been used in this case and in the other cases.
In addition to the offenses charged in this case, Robert was also charged with the murder of Ms. Stott and with two armed robberies that occurred minutes before her murder. He subsequently pled guilty in district court case number 357-917 to manslaughter in Ms. Stott’s death and the armed robberies of Bethany Acosta and Patrick Van Hoorebeek, which occurred on the same night as Ms. Stott’s murder.[4]
The vehicle identified in the present case was owned by Lester, no relation to Robert, who was charged in Ms. Stott’s murder and in various other armed robberies that occurred in or near the French Quarter around the same time. Lester was convicted of Ms. Stott’s murder, and this court in an unpublished opinion affirmed his conviction and sentence. State v. Jones, 96-1433, unpub. (La.App. 4 Cir. 11/26/97), 704 So.2d 993 (Table). This court also affirmed Lester’s convictions and sentences for the armed robberies of Theresa McKay and Latrice Robinson, both of which occurred within hours after Ms. Stott’s murder. State v. Jones, 94-0071 (La.App. 4 Cir. 3/29/95), 653 So.2d 746. The state apparently 15never charged Lester with the robberies of Lorrell Wood-fork and Donna Freeman, which occurred five nights later, after Robert was arrested.
The following fact summary of the present case is taken from this court’s unpublished opinion in Robert’s appeal:
On the evening of April 6, 1992, a group of friends consisting of three males and three females took a walk through the French Quarter to the river. Two of the males had a disagreement and left early. As the remaining four approached Rampart Street on their way home, a man approached them, *786 pulled out a gun, and told them to move to the side. One of the females was walking up ahead and was not stopped. The others were ordered to walk with the perpetrator up and down Rampart Street. At one point, the perpetrator made them lie face down and give him their money and their jewelry, which all three did. After they got up, the perpetrator ordered them to walk back into the French Quarter. They walked as couples, with the perpetrator in the back with one of the females and the male and the other female up ahead. When the female in front started to walk too fast, the perpetrator clicked the gun and told her to. slow down.
After they walked as couples for awhile, the perpetrator ordered the two in front to take off their clothes and get under a car, which they did. When the female walking with the perpetrator started to take off her clothes, he told her not to do that because she was coming with him. He told the couple under the car to stay there and had the other female take their clothes and drop them on the corner. The perpetrator then walked with the female to a burgundy colored car. After a few minutes, the male robbery victim got out from under the car, found the clothes, put his on and brought the female’s clothes to her. They then started yelling for the other female and rode around with the police trying to find her.
Meanwhile, the perpetrator ordered the abducted female into the burgundy car. He drove her into the Desire Housing Project. The victim recognized the area and was thinking of the people she knew there who would help her if she could get away. The perpetrator took the victim to an abandoned building where he ordered her to take off her clothes. He then raped her |fianally, orally and vaginally. He threw her clothes out the window. He then ordered her to get into a crawl space under another building in the project. The victim found some trash bags under there. She intended to empty one of them to cover herself while she looked for help. When she emptied one of the bags, she found a pair of pants and a shirt, which she put on. She then slowly walked past the perpetrator, who was sitting in the car expecting the victim to come out screaming and naked.
The victim walked to the apartment which had been occupied by her grandmother’s friend. That woman no longer lived there, but her daughter let the victim inside. The victim took a bath and called her sister. The resident of the apartment called the victim’s uncle, who came for her. He called the police who took the victim to Charity Hospital, where she was given a sexual assault examination. The results of the examination were consistent with the victim’s history of recent vaginal intercourse and forced anal intercourse. The pathologist’s testimony further indicated that seminal fluid was found in the victim’s vagina. After the examination, the investigating officer took the victim back to the scene of the sexual offenses, and the victim identified her clothes which were nearby.
On April 17, the victim was taken to the police sketch artist, with whom she developed sketches of the perpetrator with and without eyeglasses. On April 18, the lead rape detective was doing a follow-up interview with the victim when she received word of a possible suspect developed by the Robbery Division through Crimestoppers. The victim viewed a photographic lineup and positively identified the defendant, Robert Jones, as her assailant. R. Jones was arrested that night. On April 21, she *787 and the other victims viewed a physical lineup in which Jones was positively identified by the rape -victim and the male robbery victim. The rape victim became so emotional when R. Jones walked out in the physical lineup that she had to be removed from the room. The other female, who testified that she never got a good look at the perpetrator, identified someone else in the lineup.
The next day, officers observed a car in the project which resembled the one in which the victim was abducted. Lester Jones approached the car and asked the officers why they were looking at it. He was immediately arrested. Lester Jones was wearing a medallion which was identified as having been taken 17from one of the women during the robbery. Eyeglasses similar to the ones worn by the perpetrator were found in the car. The victim identified the car as the one in which she was abducted. On April 22, the victims were asked to view another physical lineup, this time with Lester Jones. None of the victims identified anyone from that lineup. The rape victim and the male robbery victim insisted that R. Jones, whom they had identified the day before, was the perpetrator.
R[obert] Jones and several members of his family testified that he was at a birthday party for his son on the evening in question.
State v. Jones, 96-2453 at pp. 2-4.
In addition to the facts recounted above, at trial, L.J., one of the robbery victims and the future husband of T.P., the rape victim, testified as to the route that the robber made him, T.P., and H.T., the friend, take during the robbery. He described the robber as neatly dressed, with a fresh haircut, and wearing glasses. L.J. insisted that T.P. never described the perpetrator to him, but she told him that she could identify the man. He testified that Detective Coffee asked him to view a physical lineup on 21 April 1992, telling him that the police believed they had found the robber. He stated that from that lineup he identified Robert as the robber. L.J. testified that T.P. started crying during the lineup and left the auditorium. By the time of trial, L.J. could not remember the exact description that he gave the police of the robber, but he told them that the robber was taller than he was.
Detective Debra Coffee of the New Orleans Police Department (“NOPD”) testified that she re-interviewed T.P. on 18 April 1992, several days after the rape, and by that time the police had the name of a suspect (apparently from a Crimestop-pers tip concerning the 14 April 1992 murder and attempted robbery of Julie Stott). She stated that she showed T.P. a photo lineup, from which T.P. chose |8Robert’s photograph as depicting the man who robbed, kidnapped, and raped her. She testified that when she gave T.P. the photographs, T.P. looked through them, removed Robert’s photograph, looked at the rest of the photos, and then went back to Robert’s photograph and told the detective that he was the perpetrator.
Detective Coffee set up a physical lineup on 21 April 1992 that contained Robert, which was attended by T.P., L.J., and H.T. While the suspects were entering the stage, T.P. began shaking and crying, and Detective Coffee removed her from the auditorium to an interview room. T.P. identified Robert from the lineup. The detective testified that she took T.P. back into the auditorium and then escorted L.J. into the interview room, where he also identified Robert. Detective Coffee took L.J. back into the auditorium and took H.T. into the interview room, where she chose someone else from the lineup.
*788 Detective Coffee testified that after Lester was found with the car that fit the description of the car used in the rape and was located in the same area where the rape occurred, she arranged for a second physical lineup on 22 April 1992 that contained Lester. T.P., L.J., and H.T. viewed that lineup but chose no one. Detective Coffee testified that both T.P. and L.J. told her that the person they identified in the lineup the day before, Robert, was the perpetrator. The detective admitted that she did not conduct a lineup that contained both Robert and Lester.
Detective Coffee stated that the description she obtained from T.P. on the night of the incident was contained in her supplemental police report. At that point, counsel asked for the report, but the trial court denied the request. Nonetheless, Detective Coffee testified that T.P. told her that the assailant was a black male with a medium brown complexion, clean-shaven, with short wavy hair, 5'7" to 5'8", 140-150 pounds, wearing wire rim round glasses.
laDetective Herman Cade testified that Robert was developed as a suspect from a Crimestoppers tip. Detective Cade put together a photo lineup that contained Robert’s photo. He also recovered the car on 22 April 1992 from near the scene of the rape, and at the time it was in Lester’s possession. Also in Lester’s possession was a medallion that had been stolen from H.T. during the robbery. The prosecutor asked Detective Cade: “Do you know whether or not through your investigation Lester Jones knows Robert Jones?” Detective Cade replied: ‘Tes.” Detective Cade testified that Lester was convicted of armed robbery and murder, but he was not implicated or suspected in a rape. The defense’s objection to this statement was sustained. Detective Cade also testified that in addition to H.T.’s medallion, Lester was found with several pieces of jewelry. When asked if these other pieces were stolen in the robberies of T.P., L.J., and H.T., Detective Cade replied: “Not in this one.” Detective Cade admitted that he never saw Robert and Lester together, and no property taken from the robbery of T.P., L.J., and H.T. was found in Robert’s possession or at his residence.
The state had Lester brought into court, and Lester showed the jury his teeth.[5]
H.T. testified, admitting that she did not see the robber’s face very well. She testified that at the 21 April 1992 lineup that contained Robert, she chose the “wrong” man; on cross-examination, she stated that after identifying the other man, the police told her that she had chosen the wrong person.
Patricia Daniels, a criminalist for the NOPD, testified that swabs taken from T.P. were inconclusive as to whether Robert contributed the seminal fluid found on the swabs. Likewise, Detective Al Sisón, another criminalist for NOPD, examined ImT.P.’s clothing but was unable to find any conclusive evidence that Robert’s saliva, blood, or pubic hair were on the clothing.
T.P. described the robbery, kidnapping, and sexual assault. She testified: “I looked him in the face about five or six times” while the assailant was walking her and her companions through the French Quarter. She testified that after he forced L.J. and H.T. to disrobe and get under a car, he told her to gather the clothing, and then he forced her into another car through the driver’s side door, using the same door to exit when they arrived at the Desire Housing Project. She testified that during the kidnapping and assault, the perpetrator told her that he had been sent *789 overseas in the military, which had given him nothing, and he had to take “it” from people like her. She described her assailant as having very broad shoulders and a light mustache, and she testified that during the ordeal he kept his mouth rigid “where like if you don’t have nothing in your mouth, just — no gold.” However, at some point during the rape, he looked out the open door, saw a man walking by, and asked the man if he wanted some of “this.” T.P. testified that at that time, she saw a gleam coming from his mouth and noticed that his mouth was full of gold. With respect to the 21 April 1992 physical lineup, T.P. testified that she recognized Robert immediately from his walk, his size, and the set of his shoulders. At that point, she began screaming. She positively identified Robert as the man who robbed, kidnapped, and raped her. She denied seeing any television broadcasts or reading any newspapers before identifying him.
Robert called various relatives and friends who testified that he was at his son’s birthday party at the time of the robberies, kidnapping, and rape. Kendra Anderson, the mother of Robert’s other child, admitted that she did not tell InDetective Coffee when she spoke with her that Robert did not leave the party. Gail Brock, Robert’s aunt, also did not tell the police that Robert was at the party and did not leave. Chiquita Jones, Robert’s sister, also testified that the police later searched his residence for “Julie Scott’s” jewelry, but they found nothing.
Robert denied committing the robberies, rape, and kidnapping, insisting that he was at his son’s birthday party at the time they occurred. He also denied ever being in the military. He insisted that he has had gold teeth since 1989.
During his opening statement, the prosecutor admitted that Lester was convicted of armed robberies and first degree murder, which occurred in the French Quarter. He also stated that Lester was never implicated in any rapes or kidnappings.
During his closing argument, defense counsel emphasized that L.J. never mentioned that the perpetrator had gold teeth. In addition, he reminded the jury that Detective Coffee never testified that T.P. told her that her assailant had gold teeth. He insisted that the trial was the first time that T.P. indicated that the perpetrator had gold teeth. He argued that T.P.’s actions when viewing the physical lineup tainted L.J.’s subsequent identification of Robert. He emphasized that the car used in the rape was found in Lester’s possession, and glasses, like those worn by the perpetrator, were found inside the car. In addition, Lester was in possession of H.T.’s medallion, while Robert was not in possession of any of the stolen property. Counsel reminded the jury that Lester had convictions for armed robbery and first degree murder. He also pointed out that Robert did not have wavy hair and does not wear glasses.
During the state’s surrebuttal, the prosecutor stated that T.P. could identify her assailant because she was with him for several hours. With respect to the gold |12teeth, the prosecutor argued that T.P. testified that the perpetrator had been holding his mouth rigid during the incident, and it was not until he turned to talk to a passerby that she noticed his gold teeth. As for T.P.’s actions during the 21 April 1992 physical lineup, the prosecutor noted that Detective Coffee quickly led her from the auditorium as the suspects were walking onto' the stage. With respect to the use of the driver’s side door, the prosecutor “explained” that the passenger side door was damaged. With respect to the relationship between Robert and Lester, the prosecutor stated: ‘We *790 know that the defendant knows Lester Jones. That’s uncontroverted. Remember, Detective Cade testified that though the investigation, he discovered that Lester Jones and the defendant were friends. We know they interacted.” The prosecutor stated that he could only assume that Lester traded the use of the car for the jewelry he received, stating: “But we know that there’s a link between Lester and Robert, uncontroverted. It’s never been denied, and we know it to be true. It’s in evidence.” The prosecutor concluded by noting that Lester could not have been the perpetrator because T.P. identified Robert. . The prosecutor stated that the two men looked nothing alike. He stated: “We know that Robert Jones used the car, and we know that he knows Lester Jones.” The prosecutor explained that he did not call Lester on this point because he believed that Lester would not testify for the state and against his friend.

III.

THE OTHER ROBBERIES FROM APRIL 1992
Four other robberies/attempted robberies were committed in April 1992 in the French Quarter. The relator pled guilty to the 14 April 1992 robbery of Bethany Acosta and Patrick Van Hoorebeek, which occurred on Governor Nicholls Street at 11:30 p.m. Mr. Van Hoorebeek’s ring and watch were found in Lester’s 11spossession. Ms. Acosta identified Robert in a photo lineup as the perpetrator. Neither she nor Mr. Van Hoorebeek was able to identify him or Lester in physical lineups; in Lester’s lineup, both identified another man.
The next attempted armed robbery, first degree murder, and attempted first degree murder occurred immediately after and around the corner from the Acosta/Van Hoorebeek robberies. During this attempted robbery, the assailant shot Peter Ellis and shot and killed Julie Stott. Mr. Ellis was unable to make an identification in that case. He also told the police that he noticed only one robber. Thomas Van Develde, who lived in the block where the shooting occurred, initially told the police that he could not identify the shooter. Over three months later, he identified Lester from a physical line up as the man whom he saw walking away from Ms. Stott’s body, holding a gun, and Robert as the man whom he saw rifling through Ms. Stott’s clothing.[6] Both Robert and Lester were charged in connection with this robbery. The relator pled guilty to manslaughter in that case, and Lester was convicted of the second degree murder of Ms. Stott.
The third incident occurred on 15 April 1992 within hours after Ms. Stott’s murder and near the French Quarter. The two victims, Theresa McKay and Latrice Robinson, both identified Lester as the robber. He was convicted in both armed robberies.
The last robbery occurred in the French Quarter on 20 April 1992, after Robert had been arrested. One of the victims, Donna Freeman, identified Lester as the perpetrator, while the other victim, Lorrell Woodfork, identified another man.

JuIV.

ISSUES RAISED ON APPEAL AND IN PRIOR APPLICATIONS
On appeal, counsel raised two assignments of error: (1) the defendant’s convictions for first degree kidnapping and aggravated rape violated his right against double jeopardy; and (2) the court imposed an illegal sentence with respect to *791 the count for the crime against nature. Robert filed a pro se brief wherein he alleged that the court should have granted his motion to quash the charges due to untimeliness. As noted above, this court granted relief only as to the sentencing issue.
In his first application for post-conviction relief, filed in 2000, the relator raised three errors: (1) the state failed to preserve evidence significant to his innocence, including semen-stained clothing, evidence gathered during a rape examination, and fingerprint evidence; (2) prosecutorial misconduct involving the use of leading questions during direct examination, bringing Lester into court clothed in prison attire, and closing argument involving what he termed as facts not in evidence; and (3) ineffective assistance of counsel for failing to investigate his alibi defense and failing to object to Lester being brought into court wearing prison attire. The trial court and this court rejected these claims.
Different counsel filed his second application for post-conviction relief in 2006 based on claims of newly-discovered evidence and the withholding by. the state of Brady[7] evidence. The newly-discovered evidence was Lester’s statement in 2005 that, contrary to two statements that he gave to the police, he did not know Robert and never loaned him his car; he also stated that he only made statements to 1 isthe contrary to the police because he was being beaten. The Brady claim included this information as well as information in a supplemental police report, obtained in 2005, concerning a description T.P. gave of the perpetrator in this case that the relator insisted did not match the description that she gave at trial. The claim also included an allegation that the results of DNA testing by the FBI reported to the defense were not accurate. The trial court denied relief on these claims. On review, this court also denied relief on these claims, as well as refusing to consider an additional Brady claim concerning the victim’s testimony at trial concerning the car, which claim had not been raised in the district court.

V.

DISCUSSION
In the present writ application, filed by yet different counsel, the relator contends that he has discovered yet more evidence that points to his innocence and shows that Lester was the sole perpetrator of all of the robberies and of the rape, kidnapping, and crime against nature in this case. He acknowledges that he previously obtained the police file pursuant to a public records request (which formed the basis of his second post-conviction application). He asserts that present counsel subsequently made other requests for specific items. He alleges that in May 2010, he obtained Detective Coffee’s notes from the rape/robberies and the criminal investigation bureau’s report; in August 2010 he obtained NOPD incident reports concerning armed robberies involving Lester from Lester’s Orleans Parish Indigent Defenders Office files; and in September 2010 he received from the district attorney’s office files concerning Lester and copies of statements given by Bethany Acosta, who was robbed within minutes of Ms. Stott’s murder, and by Thomas Van Develde, who heard the shots and saw a man walking away from Ms. 116Stott and leaving in the same car as was identified in the other robberies.[8] The relator alleges that these *792 newly-discovered documents show that the rape victim changed her description of her assailant to match him, not Lester. He further alleges that she also changed her account of her abduction with respect to which side of the car the perpetrator forced her to enter and exit. He notes that the victim initially told the police that the perpetrator made her enter and exit the car used in the kidnapping through the passenger door, but at trial she testified that she entered and exited through the driver’s door, and that while the car did indeed have damage to the passenger door when the police recovered it, this damage occurred after the kidnapping and rape in this case. He notes that this discrepancy was another indication that T.P.’s version of the incident changed over time. He asserts that the victim failed to testify at trial that in her initial statement to a detective, she stated that the perpetrator said he was going to take her to “his neck of the woods.” This is material, he claims, because he did not live near the scene of the rape, but Lester did. Robert’s present writ to this court raises four claims that he asserts entitles him to relief: (1) the state withheld Brady material; (2) his counsel was ineffective; (3) the trial court erred by finding that he was not entitled to raise actual innocence in his post-conviction application; and (4) the court erred in denying his hearsay/confrontation claim. La. C.Cr.P. art. 930.2 puts the burden of proof on the relator to prove that he is entitled to relief.
117a-

The Relator’s Brady Claim

Robert lists eleven items of information that he contends the state withheld and which he asserts was evidence that was material to his guilt. He admits that he obtained two of them, and parts of a third, in 2005, prior to filing his previous post-conviction application. The eleven items are:
(1) Detective Coffee’s handwritten notes containing T.P.’s initial description of the assailant, which estimated his age as twenty-five to thirty and made no mention of gold teeth;
(2) Detective Coffee’s supplemental NOPD report containing T.P.’s initial description of the perpetrator, which estimated his age as twenty-five to thirty and which made no mention of gold teeth;
(3) the 911 call log, in which L.J. and H.T. estimated the perpetrator’s age as the late twenties and made no mention of gold teeth;
(4) T.P.’s statement, reflected in the supplemental report, that she initially told the police that she entered and exited the perpetrator’s car through the passenger side;
(5) T.P.’s statement, reflected in Detective Coffee’s handwritten notes, that the perpetrator told T.P. that he was going to take her to his “neck of the. woods;”
(6) the fact that the tip from Crimes-toppers that identified the relator actually concerned the killing of Ms. Stott and was false;
11S(7) the belief by the police that Lester, not the relator, was responsible for the crime spree of April 1992 in the French Quarter while using Lester’s car;
(8) the fact that Lester had jewelry from multiple robberies when he was arrested;
(9) the fact that the last robbery occurred after the relator was in custody;
(10) the fact that Lester initially told the police that he did not know Robert; and
*793 (11) the fact that Detective Cade and Detective Jimmy Stewart (who was in charge of the murder investigation) determined that there was no connection between the relator and Lester, coupled with Detective Stewart testifying that he told an assistant district attorney that he thought only one person, not the relator, was involved in the 14-15 April 1992 crime spree.
Robert admits that when he filed his previous post-conviction relief application in 2006, he had obtained parts of Detective Coffee’s supplemental report, the 911 log, and the report concerning the Wood-fork/Freeman robbery.
The Due Process clause of the Fourteenth Amendment requires that the state disclose to the defense evidence that is favorable to the defense and is material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963);[9] State v. Garcia, 09-1578, p. 51 (La.11/16/12), 108 So.3d 1, 36-37 cert. denied, Garcia v. Louisiana, — U.S. -, 133 S.Ct. 2863, 186 L.Ed.2d 926 (2013); State v. Hollins, 11-1435 (La.App. 4 Cir. 8/29/13), 123 So.3d 840, 858, writ denied, 13-2555 (La.4/25/14), 138 So.3d 642; State v. Crawford, 02-2048, pp. 9-10 (La.App. 4 Cir. 2/12/03), 848 So.2d 615, 623-624. This requirement includes evidence that impeaches a witness whose credibility or reliability may determine guilt or innocence. Giglio v. U.S., 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Garcia; State v. Bright, 02-2793, p. 9 (La.5/25/04), 875 So.2d 37, 43-44.
In U.S. v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Court defined materiality: “The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ‘reasonable probability is a probability sufficient to undermine confidence in the outcome.” See also Smith v. Cain, — U.S. -, -, 132 S.Ct. 627, 630, 181 L.Ed.2d 571 (2012), where the Court explained: “A reasonable probability does not mean that the defendant ‘would more likely than not have received a different verdict with the evidence,’ only that the likelihood of a different result is great enough to ‘undermine[ ] confidence in the outcome of the trial.’ Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (internal quotation marks omitted).”
The Court further discussed “materiality” in Kyles, 514 U.S. at 434-435, 115 S.Ct. 1555:
Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant’s acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant) _Bagley ⅛ touchstone of materiality is a “reasonable probability” of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have [¡^received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A “reasonable *794 probability” of a different result is accordingly shown when the Government’s evidentiary suppression “undermines confidence in the outcome of the trial.” Bagley, 473 U.S. at 678, 105 S.Ct. at 3381.
The second aspect of Bagley materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a Brady violation by demonstrating that some of the inculpa-tory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.
See also Hollins; State v. Haywood, 04-2097, pp. 7-8 (La.App. 4 Cir. 6/15/05), 907 So.2d 168, 172-173; State v. Goodwin, 04-0466, p. 6 (La.App. 4 Cir. 8/18/04), 881 So.2d 1229, 1233-1234; State v. Greco, 03-0709, pp. 18-20 (La.App. 4 Cir. 12/17/03), 862 So.2d 1152, 1165-1166.
Nonetheless, the mere fact that exculpatory evidence is withheld does not automatically entitle a defendant to a new trial. As the Court noted in Bright:
Nevertheless, it is important to note that Brady and its progeny do not establish a general rule of discoverability, and not every case in which it is discovered post-trial that favorable evidence was withheld by the State will result in a reversal of the conviction. A prosecutor does not breach any constitutional duty to disclose favorable evidence unless the “omission is of sufficient significance to result in the denial of the defendant’s right to a fair trial.” United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). For purposes of Brady’s due process rule, a reviewing court determining materiality must ascertain:
not whether the defendant would more likely than not have received a different verdict with Lithe evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. [Emphasis supplied.]
Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). See also, State v. Strickland, 94-0025, p. 38 (La.11/1/96), 683 So.2d 218, 234. Thus, the reviewing court does not put the withheld evidence to an outcome-determinative test in which it weighs the probabilities that the petitioner would have obtained an acquittal at trial or might do so at a second trial. Instead, a Brady violation occurs when the “evi-dentiary suppression ‘undermines confidence in the outcome of the trial:’ ” Kyles, 514 U.S. at 434, 115 S.Ct. at 1566 (quoting Bagley, 473 U.S. at 678, 105 S.Ct. at 3381).
Bright, p. 6, 875 So.2d at 42; see also Garcia.
b.

Change in Description of the Perpetrator

The relator first argues that items (l)-(3) listed above show that T.P. altered her description of her assailant to fit that of the relator. He notes that Detective Coffee’s handwritten notes, which she took when she first interviewed T.P., indicate that T.P. described her attacker as twenty-five to thirty years old and made no mention of him having gold teeth. Detective *795 Coffee’s supplemental police report[10] also indicated that T.P. described the perpetrator as twenty-five to thirty years old and also did not mention him as having gold teeth. The 911 call log, which the relator may or may not have obtained prior to filing his 2006 post-conviction relief application, shows that L.J. and H.T. reported that the robber was in his late twenties, and they did not mention gold teeth. The relator points out that 122while he was only nineteen in April 1992, Lester was thirty years old at that time.[11] The relator did not have these items at the time of trial.
At trial, the description given by L.J. did not contain an age estimate or any mention of gold teeth. T.P.’s description at trial of her perpetrator also did not include an estimate of his age; instead, she mentioned his very broad shoulders and a light mustache. Detective Coffee testified that T.P. gave her a description a few days after the rape that matched the one she gave on the night of the rape.[12]
Robert now argues that had he had access to the descriptions given by L.J. and T.P. on the night of the crimes, he could have impeached their identifications of him as the perpetrator, given that their estimate of the age of the perpetrator matched Lester, not him, and neither of them mentioned the perpetrator having gold teeth. He asserts that this information was material to the issue of his guilt because it bolstered his claim that Lester, not he, was the perpetrator of the crimes in this case.
In rejecting this claim, the trial court noted that trial counsel had the 911 dispatch log which contained the description given by L.J. The relator disputes this finding, asserting that trial counsel testified that he did not receive anything other than the state’s answer to his motion for a bill of particulars and discovery, which did not contain the 911 log. The court then correctly noted that by the time the relator filed his 2006 application, he had Detective Coffee’s supplemental police report, and he used it in connection with the claims he raised in that application. Indeed, in this court’s unpublished opinion in the “appeal” he took from the denial of this claim, this court rejected this claim with respect to the ^supplemental police report because it found that trial counsel had received the 911 log, which described the perpetrator as being in his late twenties. State v. Jones, 08-0516, p. 17. However, as noted above, it is not clear that trial counsel had this log at the time of trial.
In its latest response, the state argues that the relator could have obtained the supplemental report, Detective Coffee’s handwritten notes, and the 911 log as early as 1998, once his appeal was final. It argues that the relator did not show due diligence in obtaining these items, citing a U.S. Fifth Circuit case that required a defendant to show due diligence with respect to a Brady claim. See Rector v. Johnson, 120 F.3d 551, 562 (5th Cir.1997). The state ignores long-standing jurisprudence that has held that La.C.Cr.P. art. 930.8 A, as it existed at the time the relator filed the present application and up until 1 August 2014,[13] imposed no express *796 due diligence requirement on a defendant. As noted by the Court in a per curiam opinion in State ex rel. Walker v. State, 04-0714 (La.1/27/06), 920 So.2d 213:
Relator’s discovery of arguably suppressed evidence allows his untimely filing without regard to his diligence vel non in seeking the suppressed material. La.C.Cr.P. art. 930.8(A)(1); La. C.Cr.P. art. 930.8(B); Carlin v. Cain, 97-2390 (La.3/13/98), 706 So.2d 968; State v. Lanieu, 03-2640 (La.10/1/04), 885 So.2d 512; see also Banks v. Dretke, 540 U.S. 668, 695, 124 S.Ct. 1256, 1275, 157 L.Ed.2d 1166 (2004) (“Our decisions lend no support to the notion that defendants must scavenge for hints • of undisclosed Brady material....”). The district court is accordingly ordered to appoint counsel for relator and hold a hearing at which the court will afford the state the opportunity to show that delay “caused by events not under [its] control” have prejudiced it. La.C.Cr.P. art. 930.8(B); Carlin v. Cain, 97-2390 at 2, 706 So.2d at 968-69; State ex rel. Cormier v. State, 95-2208 (La.10/4/96), 680 So.2d 1168. If the state does not make this showing, the district court shall determine on the merits whether the state suppressed material exculpatory information in violation of the rule of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and progeny. [Emphasis added]
See also Carlin v. Cain, 97-2390 (La.3/13/98), 706 So.2d 968.
As noted in this court’s unpublished opinion, the state did not allege in 2006 that it was hampered by the late discovery of the supplemental report. In addition, it makes no such allegation with respect to the present claim.[14]
Here, the relator obtained portions of Detective Coffee’s supplemental report in 2005; he apparently obtained the entire report in 2010. He obtained Detective Coffee’s notes in 2010. While it is unclear when he obtained the 911 log, he did not have the supplemental report or Detective Coffee’s notes at trial, and his trial counsel testified that he would have used this information as to the perpetrator’s estimated age and the lack of any gold teeth in the descriptions to impeach the identifications made by T.P. and L.J. While the jury was aware that the composite prepared under T.P.’s direction was similar to Lester (both were shown at trial), the age descriptions given at the time of the offenses were consistent with Lester’s age, not that of Robert.
[25With respect to the lack of mention of the gold teeth in these three documents, the state notes that defense counsel argued during closing argument that the first mention of gold teeth occurred during trial. However, this was pure argument on counsel’s part; he had no evidence to support this argument, which could have been found in the supplemental report and *797 Detective Coffee’s notes, neither of which counsel had at trial. In addition, even if counsel had had the 911 log at trial, it contained only the description given by L.J. and H.T. H.T. did not spend as much time and was not in as close contact with the perpetrator as L.J.
By the same token, T.P. identified Robert in a photo lineup, and both T.P. and L.J. identified him in the 21 April 1992 physical lineup; H.T. identified someone else in that lineup. In addition, neither T.P. nor L.J. identified Lester in the 22 April 1992 lineup, telling Detective Coffee that they had identified the perpetrator in the earlier lineup. Nonetheless, the initial descriptions by all three victims did not include any mention of gold teeth and estimated the perpetrator’s age as much older than the relator; this information was unknown by trial counsel, and he indicated that.he would have used this information to impeach the victims’ identifications had he know it.
Thus, we find that the withholding of this impeachment evidence undermined confidence in the jury’s verdict.
c.
Change in T.P. ⅛ Testimony to Show Her Memory Changed
Robert next refers to items (1)-(4) listed above to support his argument that T.P.’s-memory changed from the time of the offense to trial with respect to her description of her assailant. Items (1)-(3) are discussed above; item (4) is the discrepancy between T.P.’s statement on the night of the rape and her trial | ^testimony concerning what door she entered and exited the perpetrator’s car. According to the supplemental police report, she told Detective Coffee that the perpetrator had her enter the car in the French Quarter and exit it in the Desire Housing Project through the passenger door. At trial, she testified that he had her enter and exit through the driver’s door because the passenger door was damaged. T.P. identified a photo of the car, which was taken after it was seized on 22 April 1992. There is some indication that the damage to the door occurred during a robbery that occurred after the crimes in this case. In rejecting this claim, the trial court noted that it did not matter which door T.P. used in entering and exiting. The relator acknowledges this fact, but he argues that the court failed to see the significance of this change in testimony: it was not to show which door she used, but to show that her memory of the events, which occurred almost four years before trial, had changed to conform to the state’s case, including a description of the perpetrator that conformed to Robert.
In its response, the state argues that T.P. identified the relator in a lineup before she had been informed that a suspect was identified. It is unclear from the record before us that this is true. Detective Coffee testified at trial that on 18 April 1992, while T.P. was at the police station giving a statement, Detective Coffee learned that a suspect had been named. She took T.P. upstairs to the robbery division and showed her a lineup that contained Robert’s photograph, which T.P. identified. Thus, it appears that the relator was a suspect when T.P. viewed the lineup. The state also argues that because defense counsel addressed the issue of T.P.’s description of the car in his closing argument, the discrepancy of which door she used cannot be the basis of a Brady claim. However, a review of the transcript |27of the defense’s closing argument shows that this issue was not addressed in counsel’s closing argument.
As noted in the discussion of the first Brady claim, the victims’ identification testimony at trial differed from that given at *798 the time of the offenses. It is unclear, however, whether the fact that T.P. changed her testimony as to the door she used showed that she also changed her testimony with respect to the identity of the perpetrator in order to conform to the state’s case.
Thus, we find that the trial court did not err in denying this particular claim.
d.
The “Neck of the Woods ” Comment by the Perpetrator
The relator next argues that the state withheld material evidence that showed that the perpetrator lived in the Desire Housing Project, where in fact Lester lived. According to Detective Coffee’s handwritten notes, which the relator did not receive until 2010, T.P. told the detective that the perpetrator told her, “I am taking you to my neck of the woods.” He points out that Lester lived near the site of the rape, and Lester’s car, which was used in the kidnapping and rape, was found in the same area. He asserts that had he known of this statement by the rapist, he could have used it to bolster his defense that Lester was the perpetrator. In dismissing this argument, the trial court noted that the jury was aware that the rape occurred in the area where Lester lived. Indeed, ample testimony from Detective Coffee, Detective Cade, Officer Nevil, and T.P. was presented showing that the rape occurred in the Desire Housing Project and that Lester lived there. Nonetheless, Robert now argues that the importance of this statement is not that the rape occurred near where Lester lived; rather, it is important because the rapist 12Rtold T.P. that he was going to take her to his neck of the woods, a factor in determining the identity of the perpetrator.
In its response, the state notes that a supplemental report reveals that not only did Lester .live in the area, but also evidence was presented that the relator and his companions, Christopher Bordere and Pernell Harris, who were all mentioned in the Crimestoppers tip concerning Julie Stott’s murder, frequented and sometimes stayed in a residence in the Desire Housing Project. Contrary to the state’s argument, the resident of the apartment, Gertrude Jynes, did not tell the police that the gun used in the murder was in the apartment. Instead, Detective Stewart’s supplemental report indicates that an anonymous caller told the police that the gun was there, but when the officers searched the apartment with Ms. Jynes’ consent, they did not find a gun. Ms. Jynes did tell the police that Robert, Bordere, and Harris frequented a certain bedroom in the apartment in April 1992. In any event, the murder weapon was found in Lester’s mother’s apartment.
Because the identity of the perpetrator was the real issue at trial (defense counsel conceded in his closing argument that the victims had been robbed and that T.P. had been kidnapped and raped), evidence that the perpetrator told T.P. that he was going to take her to his “neck of the woods” would have been material to that issue. The jurors were aware that Lester lived in the area where the rape occurred, but they did not know of the perpetrator’s statement concerning his “neck of the woods.”
We thus find that the withholding of Detective Coffee’s handwritten notes that contained evidence of this statement, which would have supported Robert’s defense that Lester was the perpetrator, undermined confidence in the jury’s verdict, and therefore the trial court erred by denying relief on this claim.
l29e-

Lester’s Crime Spree

Robert asserts that the state withheld evidence of Lester’s crime spree. *799 Specifically, he cites to an exhibit, which was the Crimestoppers tip that named the relator as the shooter in the Julie Stott murder and led to the inclusion of his photo in the lineups shown to T.P. and to Bethany Acosta, one of the victims in the armed robbery that occurred minutes before the murder. He argues that this tip was later found to be false because the police determined that Lester was the shooter. He cites to testimony by Detective Cade at the 26 September 2013 hearing, where the detective testified that after investigation, the police concluded that the same person committed the robberies, the rape, and the murder, and that person was Lester. The relator also points to the fact that pieces of property, mostly jewelry, stolen from the Acosta/Van Hoorebeek, the McKay/Robinson, and the Woodfork/Free-man robberies were found in Lester’s possession, either on his person, at his residence, or in his car. Lastly, Robert cites to the police report for the Wood-fork/Freeman robbery, which shows that the robbery occurred after he was arrested. He argues that although the jury was informed that Lester was found wearing the necklace stolen from H.T., the jury was not informed that Lester also had jewelry and other items stolen during the other robberies that occurred in April 1992 in or near the French Quarter. In fact, the only reference to any other stolen jewelry was a vague answer by Detective Cade to the question of whether any other pieces of jewelry in Lester’s possession were stolen in the robbery of T.P., L.J., and H.T., to which Detective Cade replied: “Not in this one.” The relator asserts that this evidence was in the state’s possession, was not produced, and was material to the determination of his guilt.
| snIn rejecting this claim, the trial court noted that the defense presented evidence of Lester’s crimes, and evidence of his guilt was thoroughly explored. The jury was informed that the car used in the crimes belonged to Lester, and glasses similar to those worn by the perpetrator were found in his car. The jury also knew that Lester was wearing the medallion stolen from H.T.; lived in the immediate proximity of the rape; and had been convicted of armed robbery and murder. The court concluded that even if Lester committed the other robberies, that fact did not exclude the relator from committing the offenses in this case. Finally, the court noted that T.P. and L.J. both positively identified the relator in the physical lineup and excluded Lester in a physical lineup the next day.
In its response, the state notes that Lester’s statement to the police after the Stott murder and the McKay/Robinson robbery that occurred within hours of the murder, implicated the relator, Harris, and Bordere in the murder. Lester stated that the four were riding in his car, with the relator driving, and he thought they were going to pick up some drugs in the French Quarter. Instead, the relator stopped the car, and they all got out. He stated that Robert approached Ms. Stott and Mr. Ellis, attempted to rob them, and then shot Ms. Stott. Lester stated that after the shooting they all reentered the car, drove away, and he then asked that the others let him out. He stated that he exited, and the others drove off in his car. He stated that later, when he saw his parked car and the other men driving off in another vehicle, he entered his car and found the gun, a watch, and a ring (apparently those stolen from Van Hoorebeek minutes before the murder). He then saw Ms. McKay and Ms. Robinson exiting the sandwich shop and decided to rob them. Lester told the police that he knew the relator from the Desire Housing Project, and he let him use his car to pick up drugs. Like the trial court, the state *800 |S1 concludes that Lester’s participation in any of the other robberies did not exclude Robert from committing the crimes in the present case. In addition, the state notes that contrary to Detective Cade’s 2013 testimony, at trial he testified that Lester was never implicated or suspected in a rape. However, both Lester’s and Robert’s DNA in connection with the rape and the tests were inconclusive. Thus, Lester was obviously a suspect in the rape at one point. Lastly, the state notes that the manner in which the relator became a suspect, the Crimestoppers tip in connection with the murder, was immaterial to the identifications of him made by T.P. and L.J.
Although the jury was aware that Lester had convictions for armed robbery and murder, it was not aware that these convictions arose out of crimes that were committed in the same area and near the same date as the offenses in this case. In addition, the jurors were unaware that Lester was found in possession of stolen items from these similar robberies; they were only told that Lester was in possession of jewelry not stolen in the present case.
Given these factors, we find that this evidence was significant and material, to the relator’s guilt, and its omission undermined confidence in the jury’s verdict.
f.

Evidence that Lester and Robert ■ Did Not Know Each Other

In his last Brady claim, Robert argues that the state withheld evidence that Lester and he did not know each other. The theory of the state’s case was that Lester loaned his car to Robert for use in the robberies/kidnapping/rape in exchange for jewelry stolen in the incident. In furtherance of this theory, the state called Detective Cade, who was asked whether he knew through his investigation if Lester knew the relator, and Detective Cade replied: “Yes.” The relator points to Lester’s testimony at the 17 December 2007 hearing, where he stated that he did | S2not know Robert and never associated with him. At that hearing, Lester testified that when the police arrested him, officers asked him about Robert and his companions, showed him their photographs, and suggested to him that he loaned his car to Robert. He testified that he repeatedly insisted to the officers that he did not know the relator, but the police beat him, and he finally agreed to say he loaned the car because he thought that if he did so, he would be released. He stated that he was not called to testify at the relator’s trial because he refused to testify that he knew the relator and loaned him his car; instead, the state merely called him into court and had him show his teeth to the jury. He stated that he told his own attorneys that his statement to the police was the product of a beating.
The relator also points to Detective Cade’s 2013 testimony where he stated that he looked into any relationship between Lester and the relator, and he could find no connection between them. He admitted that at trial he was asked if he knew if they knew each other, and he replied affirmatively because of the way that the question was phrased, ie., whether he knew if they knew each other. He testified: “He [the assistant district attorney] didn’t ask whether or not they were separate — how we knew. Though our investigation, we knew they was [sic] not related or ... was not friends with each other.” He testified that if he had been directly asked if the relator and Lester knew each other, he would have said no.
In rejecting this Brady claim, the trial court noted that trial counsel admitted that he had interviewed Lester before trial and learned that he did not know the relator; thus, this information cannot be *801 the basis of relief under Brady and La. C.Cr.P. art. 930.8 A. In addition, the court noted that there was no evidence in any documents in the state’s possession of the purported beating or even any threats made to Lester. Finally, the trial court correctly pointed out that this claim | Mwas repetitive because it was raised and rejected by the trial court and this court in Robert’s 2006 application.
We do not find that this information would fall within the dictates of Brady given that there is no indication that the state knew of the purported beating/threats, and the testimony of Detective Cade and Lester on this point was given years after trial. Thus, we do not find that the trial court abused its discretion by denying relief on this particular claim. Further, Robert appears to concede this point and argues that trial counsel’s failure to use Lester’s admission to him prior to trial, that he did not know the relator, constituted ineffective assistance of counsel. That claim is addressed below.
The relator concludes his entire Brady argument by citing two cases where the U.S. Supreme Court reversed defendants’ convictions based upon Brady violations in cases where there were eyewitness identifications were present.
In Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the defendant became the suspect in a murder due to information volunteered to the police by a person who knew the defendant and who possibly was the actual perpetrator. That person’s description also matched some of those given by some of the eyewitnesses. That person’s accounts of the aftermath of the murder (the supposed sale of the victim’s car to him by the defendant, the placement of the victim’s purse in the defendant’s garbage, the placement of the murder weapon behind the stove in the defendant’s kitchen) changed several times, but this information was never given to the defense. In addition, this person did not testify at trial. The Court found that the withholding of this evidence by the state violated Brady, even in light of the fact that four eyewitnesses positively identified the defendant as the perpetrator.
|34Likewise, in Smith v. Cain, — U.S. -, 132 S.Ct. 627, 181 L.Ed.2d 571 (2012), the defendant was convicted of being one of a group of men who shot and killed several people at a residence. The sole survivor of the shooting identified Smith. After his conviction, the defendant obtained police files that showed that the sole eyewitness told the police multiple times that he could not see the shooters’ faces and thus could not identify any of them. The Court reversed the defendant’s conviction, noting that the surviving victim’s identification was the only evidence that tied the defendant to the shooting.
Here, as in Kyles, the defendant was identified by the victims as the perpetrator, but as in Smith, these identifications were the only evidence that tied him to the crimes. Given the fact that there was no other evidence of the defendant’s guilt, we find that the failure of the state to turn over most of the items listed above, while not necessarily showing that the result would have been different if the jury had been apprised of them, undermined confidence in the jury’s verdict.
In conclusion, we find that the failure to produce evidence of: (1) the age estimate of the perpetrator; (2) the lack of any mention of gold teeth by the victims on the night of the robberies/kidnapping/rape; (3) the perpetrator’s statement that he was taking T.P. to his “neck of the woods;” and (4) Lester’s crime spree and the police belief that Lester committed all of the crimes, added together, violated Brady in that all of this evidence was material, and *802 its omission undermined confidence in the jury’s verdict. See Kyles, 514 U.S. at 436, 115 S.Ct. 1555, where the Court noted that in determining the materiality of the withheld evidence, the reviewing court must be “considered collectively, not item by item.” Thus, the trial court erred by | ^denying relief on these claims. The trial court correctly denied relief on the remaining Brady claims.

S-

Ineffective Assistance of Counsel

The relator next contends that the trial court erred by denying his ineffective assistance of counsel claim. He asserts that evidence that he presented at several post-conviction hearings showed that his trial counsel failed to prepare adequately for trial. He notes that he presented expert testimony that showed that counsel failed to meet minimum standards for preparation. He asserts that counsel had knowledge years before trial that Lester was a viable alternate suspect in the case, but he took no steps to investigate this possibility, including reviewing the records of Lester’s cases. He asserts that counsel should have moved to suppress the identifications in this case. He also argues that counsel should have timely interviewed the relator’s alibi witnesses, instead of waiting until just before trial to interview only those that the relator convinced to appear for the trial. The trial court rejected all of these claims. The relator further asserts that the court failed to address some of his claims of ineffective assistance of counsel.
In addressing a claim of ineffective assistance of counsel, a reviewing court must determine if the defendant met the two-prong test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). For the most part under this test, a defendant must show both that his counsel’s performance was deficient and that this deficiency prejudiced him. See State v. Williams, 06-1827, p. 30 (La.App. 4 Cir. 1/23/08), 977 So.2d 160, 176-177; State v. Mims, 97-1500, p. 45 (La.App. 4 Cir. 6/21/00), 769 So.2d 44, 72. In order to show that counsel’s performance was ineffective, a defendant must show that counsel made errors so serious that he or |anshe “was not functioning as the ‘counsel’ guaranteed to the defendant by the 6th Amendment to the federal constitution.” Mims, p. 45, 769 So.2d at 72. In order to show prejudice, the defendant must prove that the errors were so serious that he was deprived of a fair trial. “To carry his burden, the defendant ‘must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.’ ” Id., quoting from Strickland, 466 U.S. at 693, 104 S.Ct. 2052. See also Williams; State v. Crawford, 02-2048 (La.App. 4 Cir. 2/12/03), 848 So.2d 615.
This court has recognized that if an alleged error falls “within the ambit of trial strategy,” it does not “establish ineffective assistance of counsel.” State v. Bienemy, 483 So.2d 1105, 1107 (La.App. 4th Cir.1986); see also State v. Stallworth, p. 7, 08-1389 (La.App. 4 Cir. 4/29/09), 11 So.3d 541, 545. Moreover, since “opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel’s trial decisions. Neither may an attorney’s level of representation be determined by whether a particular strategy is successful.” State v. Brooks, 505 So.2d 714, 724 (La.1987). See also Stallworth.
Robert argues that he presented expert testimony that showed that trial counsel’s efforts fell below the applicable standards. At the 8 October 2013 hearing, the court *803 qualified Professor Janet Hoeffel, an associate professor of evidence at Tulane University’s Law School and a member of the Louisiana Public Defender Board, as an expert in the prevailing standards for competent defense counsel under the Sixth Amendment and the prevailing professional norms in Louisiana on competent defense representation. Professor Hoeffel testified at |R7length on the standard to be met by counsel in a criminal case and how Robert’s trial counsel did not meet those standards. Although admitting that at the time of the relator’s trial Louisiana had no standards for trials, she testified that the American Bar Association had approved standards at the time of trial that were the prevailing norms of defense counsel. She stated that defense counsel should investigate a case soon after it is filed because memories fade; she pointed out that the relator’s counsel should have asked him early in the case if he had an alibi and then investigated the alibi at that time.
Professor Hoeffel noted that although counsel filed for discovery in July 1992, the state did not respond until almost a year later, and counsel took no steps to compel discovery during that time. She stated that the fact that the incident report that counsel received showed that days after the offense, Lester was in possession of H.T.’s medallion and the car used in robbery, in which were also found glasses like those worn by the perpetrator. Yet counsel took no steps to investigate the possibility that Lester was the perpetrator. She testified that Robert’s counsel also represented him in the Aeosta/Van Hoore-beek robbery and the Stott murder, and investigation of Lester would have shown that he was a suspect in the murder and the robbery that occurred just after it (the McKay/Robinson robbery). She pointed out that the crime lab report for the rape listed Lester as a suspect and showed that samples of his blood and saliva were taken and tested, along with those of the relator. She also stated that Lester’s statements to the police, in which he admitted being in the car prior to and after the murder, and then using the car and the gun in the McKay/Robinson robbery within hours of the murder, should have signaled to counsel that Lester was a viable alternative suspect in the present case, especially given the fact that Lester used the gun and | asthe car in the Woodfork/Freeman robbery, which occurred after the relator was arrested.
Professor Hoeffel opined that in order to render effective assistance in light of this information, counsel should have obtained the incident reports from all five robberies/attempted robberies. She also opined that counsel should have interviewed witnesses and the police officers who investigated the various robberies and the murder. If he had done so, per Detectives Cade and Stewart testimony at the post-conviction hearings, they would have told counsel that they found no connection between Lester and the relator. Professor Hoeffel noted that Lester was convicted of the murder and the McKay/Robinson robbery long before the relator went to trial.[15] She pointed out that at Lester’s murder trial, the state introduced evidence of the Acosta/Van Hoorebeek robbery that preceded it as Prieur[16] evidence, but the relator was charged in that case, not Lester. Professor Hoeffel also opined that counsel should have read the transcript of Lester’s *804 murder trial and interviewed Detective Stewart; he would have learned that the police thought that Lester was the perpetrator in the Acosta/Van Hoorebeek robbery. She stated that had he done so, he would not have advised the relator to plead guilty to that robbery and to manslaughter in Ms. Stott’s murder.
With respect to the alibi witnesses, Professor Hoeffel stated that counsel should have interviewed them early in the case, obtained affidavits from them, and even obtained the relator’s son’s birth certificate to support the claim that the relator was attending his son’s birthday party at the time of the robberies/kidnapping/rape |33in this ease. The professor opined that counsel should have filed a motion to suppress the. identifications by T.P. and L.J., especially in light of prior counsel’s motion, filed on 21 April 1992, to enjoin the physical lineup held on that date, based on extensive media coverage.[17]
Professor Hoeffel stated that counsel should have emphasized the prominence of the relator’s gold teeth, given T.P.’s testimony that she did not notice them until he spoke to a passerby at some point during the rape, and the fact that they were not mentioned in the initial descriptions given on the night of the crime. She stated that counsel should have also emphasized the difference in age between Lester and the relator, given the age estimates given in the initial descriptions. She also opined that counsel should have disputed the state’s allegation that Lester and the relator knew each other. On cross-examination, the professor stated that she believed that counsel was not aware of most of these discrepancies because evidence of them was not produced by the state. She admitted that several alibi witnesses testified at trial, and that blood and saliva testing was inconclusive as to both Lester and Robert.
Trial counsel, Curklin Atkins, testified at the 17 December 2012 hearing. He stated that the only evidence against the relator was the identifications made by the victims; no forensic evidence existed linking Robert to the crimes. He testified that the vehicle used in the crimes belonged to Lester, but there was no link between the two men. He stated that he filed a motion for discovery, to which the state responded, but he received no additional discovery. He received only the original incident report, and it contained Robert’s name and a description of the incident. He stated that he did not receive any other reports or handwritten | ^detective notes, and that at the time of trial the state never produced supplemental police reports. He noted that he asked twice during trial for supplemental reports when he became aware of them through witnesses’ testimony, but his requests were denied. He also did not receive any reports as to Lester’s cases. He stated that had he received any of these items prior to trial, he would have used them to impeach the victims’ identifications, pointing out the initial descriptions. He would have highlighted the crime spree and the manner of the robberies, which included the use of the same car, and he would have pointed out that the last robbery occurred after the relator’s arrest. He also testified that he had no contact with Robert after trial.
In rejecting the relator’s ineffective assistance of counsel claim, the trial court noted that the failure to interview witnesses prior to trial concerning the lack of mention of gold teeth or concerning the age estimate was not necessary because counsel had the 911 log prior to trial, which contained this information. The court found that the decision not to inter *805 view the witnesses was trial strategy, which does not constitute ineffective assistance of counsel. The court also noted that the lack of gold teeth in the initial description was explored by counsel at trial. (Counsel asked Detective Coffee to recount what description T.P. gave her, and the description she reiterated did not include gold teeth.) In addition, counsel stated during his closing argument that L.J. did not mention gold teeth; Detective Coffee did not testify that T.P. told her that the perpetrator had gold teeth; H.T. did not mention gold teeth; and the first time anyone mentioned gold teeth was T.P.’s testimony at trial.
Addressing Robert’s claim that counsel failed to investigate and present evidence of Lester’s crime spree, the court found that this issue was thoroughly |41 explored at trial, and counsel presented evidence pointing to Lester as the perpetrator. The court also noted that the defense presented nothing conclusive to show that Lester committed the crime. The court noted that evidence of Lester’s guilt with respect to the murder and the other robberies did not exclude the relator’s guilt in this case. Thus, the court found that Robert failed to show that counsel’s failure to investigate fell below the standard of reasonableness or that the result of the trial would have been different had he done so.
In its response, the state argues that counsel’s failure to find more alibi witnesses does not show that he was ineffective because he presented five witnesses, and the testimony of more witnesses would only be cumulative to that presented. The state points out that one of the proposed alibi witnesses, who testified at the 26 September 2013 hearing, was the relator’s cousin and the wife of Christopher Bor-dere, one of the men with whom the relator was linked in the Crimestoppers tip and who was named by Lester in his statement to the police as being in the car on the night of Ms. Stott’s murder. With respect to counsel’s failure to investigate Lester’s crime spree, the state acknowledges that the supplemental reports were not produced, but it argues that any evidence contained therein would be at most “favorable,” not material. It argues that the relator has not shown what information counsel might have obtained had counsel interviewed the witnesses. The state concludes that the relator cannot base his claim of ineffective assistance on evidence that he contends was withheld by the state in violation' of Brady.
Addressing counsel’s failure to move to suppress the identifications, the state argues that the identifications were not suggestive. Citing Perry v. New Hampshire, — U.S. -, 182 S.Ct. 716, 181 L.Ed.2d 694 (2012), the state notes that only if an identification is found to be suggestive does a court look to the five factors set forth in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) to determine whether a suggestive identification presents a substantial likelihood of misidentification, and no showing is present in this case that the identifications were suggestive. See also State v. Curtis, 11-1676 (La.App. 4 Cir. 3/13/13), 112 So.3d 323, writ denied 13-0831 (La.11/1/13), 125 So.3d 419 and 13-0878 (La.11/1/13), 125 So.3d 420, cert. denied, Solomon v. Louisiana, — U.S. -, 134 S.Ct. 1939, 188 L.Ed.2d 965 (2014). The state notes that Robert bases this claim on scholarly articles published long after trial concerning the method of conducting identification procedures, of which counsel could not have been aware, as well as information that the relator contends that counsel did not know because the state withheld it. It argues that the relator’s claim, that L.J.’s identification was based solely on his wife’s outburst when Robert walked on the stage, is merely speculation.
*806 The state’s response concludes with a long explanation of why the failure of the trial court to address all of the claims is of no moment. The state points out that trial counsel did not actually testify that he did not receive the 911 call log, and it concludes that counsel did not feel the need to interview the victims and the police officers because he could rely on the 911 log, which included the age estimation and made no mention of gold teeth. Further, the state asserts that Robert failed to ask counsel if he had a strategy regarding the initial descriptions. However, as noted above, Mr. Atkins testified at the 2007 hearing that he would have used this information to impeach T.P.’s testimony concerning the gold teeth and L.J.’s and her identifications concerning their age estimations had he known about these discrepancies. The state theorizes that counsel chose to emphasize Lester’s resemblance to the composite sketch rather than hone in on any | ^discrepancies in the initial descriptions. (This assertion, however, is mere speculation.)
With respect to the lack of any relationship between Lester and Robert, the state notes that while Lester testified at a post-trial hearing that there was no relationship and that they did not know each other, he did not testify that he would have so testified if counsel had called him at trial. Nonetheless, we find it strongly indicative that he would not have so testified, especially given the fact that he willingly so testified at the hearing. As for the failure to present evidence of Lester’s crime spree, the state theorizes that if counsel had done so, he would have also presented evidence of the relator’s participation in the Acosta/Van Hoorebeek robbery and Ms. Stott’s murder. The state notes that the jury was apprised that Lester had convictions for armed robbery and murder, yet it still chose to convict the relator. The state reiterates that counsel presented a consistent theory at trial that Lester was the perpetrator, showing that Lester did not have gold teeth, had jewelry stolen in the robbery, owned the car used in the crimes, lived in the immediate area of the rape, and more closely fit the description given by the victims, while Robert did not live in the area of the rape, did not have any of the jewelry taken in the robbery, and had an alibi at the time of the crimes. We note, however, that the jury was not apprised of the similar nature of Lester’s other crimes; they were closely related in time and area to the crimes in this case; the same car was used in the other robberies and the murder; and Lester was found in possession of property stolen in these robberies as well.
It is true that counsel emphasized that T.P.’s trial testimony was the first mention of gold teeth and that Robert’s gold teeth were very prominent. Counsel did not mention the age estimate that the victims gave for the perpetrator, which ^matched that of Lester and not that of Robert. If, indeed, counsel had the 911 call log at the time of trial, which would have shown this estimate, we find it difficult to explain or understand why it would be trial strategy not to use it to impeach the identifications made by T.P. and L.J. Indeed, Mr. Atkins testified that had he known about this age estimate, he would have used this information at trial. Thus, if counsel had this information, it was error not to use it, and the relator would be apparently prejudiced by this failure.
Likewise, while the jury was aware that Lester had prior convictions for armed robbery and murder, the jury was not aware that these offenses occurred in the same general area within a few weeks of the present crimes and involved the same car used in the present case. Mr. Atkins was aware that Lester had these other convictions, but apparently did not investigate these prior convictions to discover *807 evidence of any similarities in order to bolster his argument that Lester, not Robert, was the perpetrator of the crimes in this case. We find it difficult to see how this failure to investigate Lester’s prior robberies and the murder case was trial strategy. In addition, this information was indeed strong evidence that Lester could have committed the crimes in this case as well as the crimes for which he was convicted. As noted by the relator, counsel’s burden at trial was not to prove that Lester was the perpetrator; instead, it was to show that the state’s evidence did not prove beyond a reasonable doubt that Robert was the perpetrator. It is hard to see how the failure to investigate Lester’s prior convictions and introduce evidence of the similarities noted above did not prejudice the relator.
However, in spite of the foregoing, we cannot say that the trial court was clearly wrong in its conclusion. That is, we cannot say that counsel made errors so serious that he “was not functioning as the ‘counsel’ guaranteed to the defendant |4Sby the 6th Amendment to the federal constitution” per Strickland. As such, we find that the relator has not met his burden of showing that counsel was ineffective and that this ineffectiveness prejudiced him. We conclude that his ineffective assistance claim does not clearly have merit, and the trial court did not err by denying relief on this ground.
h.

Actual Innocence Claim

The relator next raises a claim of actual innocence. He acknowledges that La.C.Cr.P. art. 930.3(7) contemplates a ground of actual innocence only with respect to DNA testing that clears a defendant. He asserts, however, that such a claim has been recognized in federal jurisprudence and has not been precluded by Louisiana jurisprudence. He argues that the evidence shows that he is innocent of the crimes for which he was convicted.
The trial court rejected this claim, noting that his claim was not cognizable because it was not based on a DNA exoneration, which it found to be the exclusive ground for an actual innocence claim. The court noted that the DNA evidence in this case has been lost, and it found that Louisiana jurisprudence did not create a non-DNA-based ground for a claim of actual innocence. The state makes the same argument in its 31 March 2014 response.[18]
La.C.Cr.P. art. 930.3, which sets forth the exclusive grounds for post-conviction relief, does not include the ground of actual innocence not based on |4fiDNA evidence.[19] The Louisiana Supreme Court has expressly cast doubt on whether a claim of “actual innocence” not based on DNA evidence is cognizable on collateral review via the post-conviction relief proceedings. See State v. Conway, 01-2808 (La.4/12/02), 816 So.2d 290. The Court nevertheless stated that, if such a claim were cognizable, it must be a bona fide claim of actual innocence. The Court explained:
Such a claim must involve “new, material, noncumulative,” and “conclusive” evi *808 dence, [People v.] Washington, [171 Ill.2d 475, 216 Ill.Dec. 773, 665 N.E.2d 1330] at 1337 [ (1996) ], which meets an “extraordinarily high” standard, Summerville [v. Warden ], [229 Conn. 397], 641 A.2d [1356] at 1372-75 [ (1994) ], and which “undermine[s] the prosecution’s entire case,” In re Clark, 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729, 739 (1993), while Conway on collateral review merely advanced an “alternative and inconsistent” theory of defense to the one he offered at trial, a tactic our jurisprudence prohibits. See generally State v. Juluke, 98-0341, p[p]. 4-5 (La.1/8/99), 725 So.2d 1291, 1293.
Conway, pp. 1-2, 816 So.2d at 291. See also State v. Matthis, 07-0691 (La.11/2/07), 970 So.2d 505.[20]
The Court again declined to determine whether a claim of actual innocence in the absence of DNA exoneration is cognizable in post-conviction review in State v. Pierre, 13-0873 (La.10/15/13), 125 So.3d 403. The defendant attacked his conviction via an application for post-conviction relief on the basis of evidence that impeached the credibility of the victim but did not prove that he was not the |47perpetrator. The Court acknowledged that in Conway, while it declined to determine if such claims were cognizable, had found that the defendant had failed to meet the burden such a claim would entail, which could require a showing that the claim involved “new, material, noncumulative and conclusive evidence which meets an extraordinary .high standard, and which undermine[s] the prosecution’s entire case.” Conway, p. 1, 816 So.2d at 291. In Pierre, the Court noted that because the defendant conceded that he could not prove a bona fide claim of innocence: “the present case is not the one for this Court to decide definitively that free-standing claims of actual innocence not based on DNA evidence are cognizable in state post-conviction proceedings.” Pierre, p. 8, 125 So.3d at 408.
We find it unnecessary to decide whether a non-DNA-based actual innocence claim is cognizable in post-conviction review because the relator has not met his high burden of showing noncumulative and conclusive evidence that he is actually innocent of the crimes for which he is convicted. Instead, the evidence that he has presented has only undermined confidence in the verdicts. Thus, as in Conway and Pierre, the trial court properly denied this claim.[21]
i.

Use of Hearsay

In his final claim, Robert asserts that the trial court erred by allowing the state to use hearsay evidence to establish that he and Lester knew each other and to use this testimony during its argument to establish a connection between them. He contends that because the trial court denied this claim without reasons, we should |4Rconduct a de novo review of this claim. The transcript of the court’s ruling indicates that it did not address this claim, but after a bench conference, the court denied all claims that were raised in counsel’s *809 application, reserving judgment on pro se claims apparently raised in another pleading (and which are not before this court).
We agree with the trial court’s ruling on this claim. First, the basis of this claim was known at the time of trial, and thus it is barred by the two-year time limitation of La.C.Cr.P. art. 930.8. Moreover, counsel made no objection to either Detective Cade’s one-word reply when questioned on this matter or to the assistant district attorney’s argument concerning it. As such, it is not preserved for review. ■ The relator makes no argument that counsel was ineffective for failing to object to these references. Finally, Detective Cade’s testimony was not hearsay; the assistant district attorney asked him if he learned through his investigation whether the men knew each other, and he replied: “Yes.” He did not relate the substance of anything that Lester or anyone else told him. The assistant district attorney’s argument implied that Detective Cade discovered that the two men knew each other, but this argument was not evidence; it was merely the assistant’s interpretation of the evidence that was presented. The jurors were aware of what evidence was actually adduced by the state on this matter. For these reasons, the trial court’s denial of this claim was not error.

VI.

CONCLUSION
While the relator has not shown that the trial court erred by denying his actual innocence claim, his ineffective assistance of counsel claim, or his hearsay 149claim, we find that the trial court erred in its denial of portions of the relator’s Brady claim. Accordingly, we grant this writ application, reverse in part and affirm in part the trial court’s rulings as to the portions of the Brady claim discussed above. Additionally, we now recall and vacate our earlier order of a stay of these proceedings and remand for further proceedings.
REVERSED IN PART; AFFIRMED IN PART; STAY RECALLED; REMANDED.

. Because more than one individual in this case has a surname of Jones, we refer to the various Joneses by their given names.

. The indictment also charged Robert with an additional count of armed robbery that arose out of an unrelated incident. Robert eventually entered a plea of guilty as charged to that count. That count is not a part of this writ application.

. Due to the nature of the offenses, this victim’s initials, as well as those of her husband and her friend, are used.

. He has filed motions to withdraw these guilty pleas in that case, but no action has been taken since 2010.

. The relevance of this “evidence” will be made evident later hereinbelow.

. Mr. Van. Develde has since died.

. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

. Mr. Van Develde also stated that a second man was left on the scene whom he thought may have been connected to the shooting.

. We note that is nearly impossible to determine whether a Brady violation will occur before trial; in virtually every case, until all testimony is presented before the trier of fact (judge or jury) at the trial determining the accused’s guilt, one can rationally argue that nothing is Brady material unless discovery establishes that it is likely to be so.

. The relator obtained a portion of this police report prior to the time he filed his 2006 post-conviction relief application.

. Lester’s date of birth is 25 July 1961, while Robert’s is 26 January 1973.

. This description also did not include an ’ age estimate or any mention of gold teeth.

. La.C.Cr.P. art.930.8 A(l), effective 1 August 2014, now additionally provides:
Further, the petitioner shall prove that he exercised diligence in attempting to discov *796 er any post-conviction claims that may exist. "Diligence” for the purposes of this Article is a subjective inquiry that must take into account the circumstances of the petitioner. Those circumstances shall include but are not limited to the educational background of the petitioner,' the petitioner’s access to formally trained inmate counsel, the financial resources of the petitioner, the age of the petitioner, the mental abilities of the petitioner, or whether the interests of justice will be served by the consideration of new evidence. New facts discovered pursuant to this exception shall be submitted to the court within two years of discovery.

. The state also asserts that the information about the age estimate was in Detective Coffee’s incident report. The state does not attach this report, and the incident report included in the relator's application does not include a description of the perpetrator.

. The docket masters of Lester’s cases indicate that he was convicted in the McKay/Robinson robbery in March 1993 and in the Stott murder in September 1994. The relator’s trial was held in March 1996.

. State v. Prieur, 277 So.2d 126 (La.1973).

. We express no opinion on whether such a tactic would have been successful.

. In this response, the first one filed by the state, it also addresses the trial court’s ruling that did not allow the relator to introduce evidence at a post-trial hearing concerning eyewitness identification. The relator does not raise that issue in his present application, and therefore that issue is not before this court.

. La.C.Cr.P. art. 930.3 sets forth the grounds for post-conviction relief, and subsection (7) provides: "The results of DNA testing performed pursuant to an application granted under [La.C.Cr.P.] Article 926, proves by clear and convincing - evidence that the petitioner is factually innocent of the' crime for which he was convicted.”

. In an unpublished disposition, this court applied Conway and reversed a trial court's grant of post-conviction relief based on a claim of actual innocence whereby the defendant presented evidence from a new witness that he was not the perpetrator of the crime. State v. Newman, 08-0349, unpub. (La.App. 4 Cir. 1/19/08), writ denied, State ex rel. Newman v. State, 08-1646 (La.5/22/09), 9 So.3d 134.

. In his initial reply brief, Robert counters that he cannot make a DNA-based innocence claim because the DNA has been lost. However, as discussed, even if such claim is cognizable for post-conviction review, he has failed to meet the high burden of showing that he is actually and conclusively innocent.