SANDRA CABRINA JENKINS, Judge.
hThe defendant, David Falgout, appeals his convictions and sentences for two counts of attempted forcible rape. Finding no merit to the assignments of error raised by his counsel and by the defendant pro se, defendant’s convictions and sentences are affirmed.
STATEMENT OF CASE
By grand jury indictment returned on January 16, 2014, the State charged the defendant with two counts of the aggravated rape of K.W. and one count of the armed robbery of the same victim. The defendant entered pleas of not guilty to both counts. On February 24, 2014, the State filed a notice of intent to introduce evidence of other crimes at defendant’s trial. After a contradictory hearing, the trial court granted the State’s motion to introduce evidence- of. defendant’s prior rape conviction. Additionally, defendant’s motion to suppress -evidence was denied. At the close of a three-day trial, a twelve-person jury found the defendant guilty of two counts of attempted forcible rape and not guilty of armed robbery. Sentencing was reset several times, and on April 16, 2015, the trial court denied defendant’s motions for. new -trial and post-verdict judgment of acquittal. After the defendant waived delays, the trial court sen *1234 tenced him to serve twenty years at 12hard labor without benefit of parole, probation, or suspension of sentence on each count. The State filed a multiple bill, alleging that the defendant was a third felony offender as to both counts. The trial court held a hearing on the multiple bill and found defendant to be a third felony offender. The trial court vacated the defendant’s original twenty-year sentences, and sentenced defendant to concurrent .sentences of life imprisonment without benefit of parole, probation, or suspension of sentence as to each count. The .trial- court denied defendant’s motion to reconsider sentence and granted his motion for appeal. Defendant’s motion to reduce his sentences below the statutory minimum was taken under advisement and, subsequently, denied.
Defendant now appeals his convictions and sentences.
FACTS
The jury convicted the defendant of two counts of attempted forcible rape that.occurred on September 2, 2013. The defendant had previously been convicted of a 1988 rape, and the State presented evidence of this rape at his trial on the present charges. With respect to the earlier rape, the State played the authenticated 911 call in connection with that rape, and then the State called former Officer William Remaudin, who investigated the rape. Remaudin stated that on June 10,1988, he responded to a call of a rape that was in progress in the 1300 block of Esplanade Avenue. He arrived at the location, and as he walked down the block, he saw the defendant raping the victim across the street from where the officer was standing. When the defendant saw the officer, he jumped up, pulled up his pants, and ran toward N. Claiborne Avenue. The defendant was captured by the officer in the same block, and the victim identified him. The officer informed the jury that Rhe testified at defendant’s subsequent trial, at which the jury convicted the defendant of rape,
V.H., testified that she was the victim of the June 10, 1988 rape. She had been waiting for the Esplanade bus, but when it did not come, she began walking down Esplanade Avenue at approximately 10:00 pm. She stated that she saw someone walk across the street, and then the defendant grabbed her, put a knife to her neck, and pushed her into a setback area of a building. He demanded her money and then demanded sex. She stated that she struggled with him until he touched her with the knife, and then she submitted. He made her lie on the ground, removed her -pantyhose, and raped her. She testified that when a police car arrived, the defendant got up, said he had to go, and then ran. She stated that the police captured the defendant, and she identified him at the scene. V.H. testified that the defendant kept putting the knife to her chest during the rape. She stated that she testified at defendant’s trial, at which he was convicted of rape.
With respect to the present charges, the State authenticated and played the 911 call that was made by KW.’s uncle on the morning of September 2, 2013. In the call, the-uncle explained that K.W. was on her way to work when a man tried to-rape her. K.W. then got on the phone and told the 911 operator that she was waiting for a bus at a stop that was located next to a construction area when a man came up to her and began speaking with' her. He then got up, put a knife to her leg, and forced her go under a “bridge,” where he took her bus fare and raped her. She stated that the rape occurred at Broad and New Orleans Streets,
. KW.’s testimony
K.W. testified that on the morning of September 2, 2013, she walked to the bus stop, while it was still dark, to catch the *1235 bus for her 7:00 a.m. shift. While ^waiting for the bus, K.W. was texting her friend when she saw a shadow walk past her. She stood up, and a man, standing near her apologized for searing her. She had never seen the man before that day. She stated that they made small talk, and he told her that he did construction work. She then looked back down at her phone, and he came up behind her, grabbed her around the neck, and placed a pocket knife to her neck. He told her not to make a sound and to follow him.
K.W. .testified that the man took her under the bridge (overpass) at New Orleans and Benefit Streets. She stated that he pulled down her pants, put his finger in her vagina and anus, anid touched her genital area. He then made her get on her knees, and he unsuccessfully tried to penetrate her with his penis several times. She testified that he then ordered her to lie down on a piece of wood that was lying on the ground, and he fondled her breasts and put his mouth on her buttocks. He told her that he would not stab her if-she did not panic. She stated that he also made her lick his penis before he left her. K.W. testified that he instructed her to stay on the scene until he left. Once the man left, she went to a nearby halfway house, where she believed she would find a policeman, and she- asked the people there if they had seen a -man dressed in the same manner as the man who had assaulted her. They-had not seen anyone meeting that description, and she then returned home, where her family called the police.
K.W. described the area of the assault as a construction area, but no construction activity was occurring at the time of the assault, and -no workers were present because it was Labor Day. She stated that the man took her behind a fence under the overpass. She stated that the phone that he took from her was never recovered. She admitted that the man was never able to penetrate her with his penis. She stated that she met with the police on the day of the assault, took them |Bto the area where the rape occurred, and then went to the hospital to be examined. She reiterated that the man threatened to- stab her if she panicked.
During cross-examination, K.W. testified that she arrived at the bus stop at around 5:30 a.m., Which was earlier than she normally arrived. She stated that she told Det. Henry that the perpetrator sweated a lot during the assault, and this led her to believe that’ he was under the influence of drugs. She stated that she believed he may have needed money to get drugs because he took her $2.50 bus fare. She explained that she had dated someone who used drugs, although she did not use them. She admitted that she told' the SANE nurse that she used marijuana, but she explained that she did not use “heavy” drugs. She denied that she smoked marijuana on the morning of the assault. When defense counsel played the tape of her statement, she admitted that she told Det. Henry that she knew the perpetrator was out looking for drugs, and the police could probably find him on Broad Street, She denied that the perpetrator told her he had money and asked her for' a “sexual favor” for which he would pay. She admitted that her phone service was cut off a few days later because she hád not paid the bill, but she denied that She performed any sexual acts for money. She stated that she'told Det. Henry that they should swab her left palm because'she had used it to grab the perpetrator’s penis, and she had not washed her hand. She insisted that she did not take a shower upon the advice of her mother.
K.W. testified that it did not appear that anyone was living in the space under the overpass where the rape occurred, nor did it appear that anyone had used the wooden *1236 board as a place to sleep. She did not recall seeing a sleeping bag under the overpass, and she saw no panhandlers out there that morning. She admitted that she sustained no physical injuries, and while she refused HIV | ^medication, she received other preventive vaccines/medication. With respect to her inability to create a composite sketch of the perpetrator, K.W. admitted that she was unable to “put the face together” with the different features in the kit, but she told the police that she would be able to identify the perpetrator if she saw him face to face. She stated that Det. Henry never showed her a photograph from which she could make an identification.
On redirect, K.W. testified that she did not remember if the perpetrator asked her for drugs. She testified that despite the fact that she could not complete a composite, she gave a physical description of the perpetrator, including his height, weight, complexion, and his clothing. She insisted that the perpetrator tried to penetrate her. She denied that the sexual encounter was for money or was consensual, and she insisted that she did not just give him her $2.50 bus fare.

Detective Reuben Henry’s Testimony

Detective Reuben Henry responded to the 911 call and met K.W. at her residence, which was approximately four blocks from the scene of the rape. He described the victim as nervous and shaking, and he conducted a recorded interview with her. He stated that K.W. was still wearing her uniform shirt at that time. He stated that he drove K.W. to the scene of the rape, and he identified photographs of the scene that were taken five or six weeks after the rape. Det. Henry described the scene as a construction area under an elevated portion of 1-610. He stated that the rape occurred behind a construction storage container that was subsequently removed from the site. He testified that he canvassed-the area for the victim’s cellphone and money that she indicated that the rapist took, but he found nothing. Det. Henry stated that he checked with the victim’s cellphone |7carrier, but because she had not activated the phone’s GPS, the carrier could not track it.
Det. Henry stated that he took the victim -to the LSU Interim Hospital for a sexual assault exam, where the victim’s clothing was seized, which he identified. He testified that swabs and a blood sample were taken from K.W. and submitted to the Louisiana State Police crime lab. He later received notification from the Combined DNA Index System (CODIS), a national database, indicating that the sample taken from the victim matched DNA previously taken from the defendant in connection with the 1988 rape. Det. Henry contacted K.W. to see if she knew him, to which she replied that she did not and had not consented to any sex with or touching by him.
Det. Henry learned that the defendant, who had a conviction for forcible rape, was not incarcerated at the time-of the 2013 rape, having been released three months prior to that rape. Det. Henry obtained an arrest warrant for the defendant. Once he located the defendant, Det. Henry obtained a search warrant for a buccal swab from the defendant to get fresh DNA to compare with swabs taken from K.W. He sent this swab to the State Police crime lab.
On cross-examination, Det. Henry testified that -he did not know if there were homeless people in the area of the rape. He stated that K.W. gave him a height and weight estimate of the perpetrator, which he included in his police report, but he admitted that the estimated weight reflected in the narrative portion of the report was probably a typographical error. He admitted that he never had any physi *1237 cal contact with the defendant. Det. Henry stated that K.W. estimated the rapist’s age as forty-one to forty-four, but the defendant was fifty-one at the time of trial. Det. Henry did not remember if he asked K.W. if she was under the influence |sof anything that would have affected her ability to identify the perpetrator, and he stated that he did not ask K.W. if she had agreed to have sex for money. He admitted that while K.W. stated that she was forced to perform fellatio on the perpetrator, she told him that she did not know if the perpetrator was circumcised.
With respect to‘the scene of the rape, Det. Henry testified that while the photographs he identified were taken several weeks afterward, they accurately reflected the scene. He admitted that no photos were taken from the area behind the storage container where the rape occurred. He also admitted that he saw no drag marks from the bus Stop to the- scene of the rape.[1] He was -unable to find any witnesses to the rape. He also saw no visible injuries on K.W.
Det. Henry testified that he did not know which pieces of KW.’s clothing were submitted • for testing at the State Police crime lab. He stated that he learned that KW.’s phone was sold right after the assault, but he was never able to recover the phone, nor did he recover the money taken in the incident or the knife that the perpetrator used. He stated that the day after the rape, K.W. met with a police artist in an attempt to make a composite sketch, but K.W. could not remember enough details of the offender’s features to complete a composite. He stated K.W. never viewed a photograph of the defendant because she was still upset at the time he tried to do so, broke down, said she was not ready to see the man who assaulted her, and refused to look at the photo.
On re-direct, Det. Henry stated that once a person is arrested in New Orleans and taken to Central Lockup, that person’s information is entered into- a database, from which an arrest register is created. He testified that when the police report was written in the present ease, the defendant had not yet been arrested. He stated that the defendant’s weight given in that report was based on old information, | flpossibly from his last arrest in 1988. Det. Henry identified the arrest register in the present case, which listed defendant’s weight, height, and his address. Det. Henry stated that normally, he would not show a victim a photograph of a suspect if there was a DNA match.

Sexual Assault Examination

The parties stipulated that Kimberly Darr, a SANE nurse, is an expert in sexual assault examination and care. Ms. Darr testified that she examined K.W. at University Hospital, and she identified her report from the exam. During her examination of K.W., K.W. admitted that she had used marijuana within the past ninety-six hours, and a test of her urine was positive for marijuana. Ms. Darr testified that she saw no physical injuries on K.W. during the exam. She took external genitalia swabs, but she did not perform an internal exam. She insisted, however, that the lack of physical injuries did not rule out rape. Ms. Darr took samples from under KW.’s fingernails and buccal swabs, as well as swabs from her breasts and buttocks because K.W. indicated that the perpetrator touched or kissed her in those areas. Ms. Darr testified that while K.W. took some preventive vaccines, she opted . out of an HIV regime, which Ms. Darr described as a twenty-eight-day, intensive regime with several side effects. In addition, K.W. indicated that there was no penile penetration.
On cross-examination, Ms. Darr testified that she met with K.W. on the morning of the rape, after K.W. had arrived at the *1238 emergency room. She stated that K.W. had no cuts, bruising, redness, swelling, or scrapes to her neck or any other' place on her body, and she had no visible genital injuries.. K.W. did not indicate that she was in pain, and Ms. Darr did not take any photographs of K.W. She also did not seize K.W.’s underwear or her pants because K.W. told her thatlmthe perpetrator had thrown them to the side, and he also had not penetrated her. She stated that K.W. refused an internal exam. Ms. Darr listed the places from which she took swabs: two from K.W.’s external genitalia; two buccal swabs; two each from each of her buttocks; two from each of her breasts; two from her left palm; two from her anal region; and two from her perineal area. On redirect, Ms. Darr explained that the lack of any cuts did not disprove that the perpetrator had a knife; the lack of tearing in the genital area, did not disprove that a-rape occurred; it was not uncommon to see no physical trauma in rape cases; and it was not uncommon for a rape victim to decline to have an internal exam. '

Forensic DNA Analysis

The parties stipulated that Elizabeth Hamilton is an expert in the field of forensic DNA analysis. She. testified that she was employed in the Louisiana State Police crime lab, and she tested the swabs taken in this. case. She identified her report from the initial test, Exhibit S-12, wherein she detailed the samples that were submitted for analysis. She testified that swabs taken from K.W.’s external genitalia (IB), her perineal area (1C), and her'breasts (IF) were'negative for acid phosphate (AP), which is found in seminal fluid, and they contained DNA that was consistent only with KW.’s DNA profile. The sample frbm K.W.’s left palm (1G) was also AP negative, and the sample was consistent with .DNA from two contributors. She stated that while K.W. could not be excluded as the major contributor of the DNA, the remaining DNA in the sample was at such a low concentration, only one allele, that she could not develop a DNA profile of the minor contributor, as she would need at least seven alleles in the sample in order for her to determine a DNA profile- of the minor contributor. Ms. Hamilton testified that she tested two hairs; in one (111) she did not detect the presence of |namplifiable DNA, while in the other (1K1) there was insufficient DNA to produce a valid profile. The sample from K.W.’s right buttock was AP negative and was a mixture of DNA from two contributors; K.W. could not be excluded as the major contributor, but there was insufficient DNA to compile a minor contributor profile. The sample from K.W.’s bra was AP negative, pnd testing showed that it contained a DNA mixture from two people. K.W. could not be excluded as the major contributor, but the DNA from the minor contributor, was in such low concentration that she could not develop a valid DNA profile.
Ms. Hamilton testified that the sample from- KW.’s left buttocks (1H) was also AP negative, but it contained sufficient DNA for her to compile major and minor DNA profiles.. Testing showed-that K.W. could not be excluded as the major contributor, but the minor contributor was unknown at that tipie. Ms. Hamilton extracted KW.’s DNA from the sample and sent the remainder to CODIS. She stated that about a week later, CODIS indicated that it had found a match for this DNA, and she notified- NOPD of. the match..- Ms. Hamilton later received two buccal swabs from the defendant, which she used to compare with the DNA profile that she found in the sample from K.W.’s left buttock (1H). She identified her report on this comparison (Exhibit S-13), from which she determined that KW. could not be excluded as the major contributor, and the defendant could not be excluded as the minor contributor. *1239 She noted that sample 1H also contained an additional allele that was not consistent with either K.W. or the defendant, but this sole allele was not sufficient, for her to develop a profile of a possible third contributor. Ms. Hamilton testified that she took the alleles from sample 1H, pulled those from each contributor,' and “applied a statistic to each allele individually which is then all compiled into one statistic.” From this comparison, |12Ms. Hamilton concluded that it was 411 billion times more likely that' the sample contained DNA that was a mixture of DNA from K.W. and the ■ defendant than from K.W. and an unrelated random individual from the Caucasian population. With respect to the African-American population, it was 195 trillion times more likely to be from K.W. and the defendant' than from K.W. and an unrelated random individual; the likelihood with respect to the Southwest Hispanic population was 54.0 times more likely to be from K.W. and the defendant than from K.W. and an unrelated random individual.
During defense counsel’s exhaustive cross-examination of Ms. Hamilton, she .admitted that she did not know how the DNA consistent with defendant’s DNA got on K.W.’s left buttock. She agreed that DNA can be transferred by direct touch and by an intermediary touching, where someone touches an object,'transfers DNA to it, and then another person touches the object, and the DNA transfers to the second person. Counsel extensively went over Ms. Hamilton’s findings and the concentration of DNA material shé observed in each sample. She agreed that she was able to develop a profile that was consistent with the defendant only from the sample on KW.’s left buttock, as this was the only sample that contained all alleles from either K.W. or the defendant. She also agreed that samples 1H (left buttock) and 1G (left palm) contained an allele that was not present in either KW.’s or defendant’s profiles, and the sample from KW.’s bra (1J1) did not contain an allele that was in the defendant’s profile. In addition, she admitted that because the oral and anal swabs (ID and IE) were both negative for sperm or semen, she did not further test them.
On redirect, Ms. Hamilton explained the difference between primary transfer (from one person to another) and secondary transfer (from a person to an object, 11sand then from the object to another person), and she. stated that there, is a higher probability of transfer of DNA material .if the transfer is primary. With respect, to seer ondary transfer, environmental conditions such as -heat, cold, and rain can destroy or degrade DNA, and she stated that for this reason, she is less likely to be able to develop a DNA profile from a secondary transfer. She stated that she did not always detect-sperm or seminal fluid in sexual assault cases, and she opined that the fact that K.W. brushed her teeth prior to submitting her oral swabs would have an impact on the ability to detect DNA in her mouth.

Defense Witness

The defense called only ofie witness, Elaido Valdez, who was a defense investigator. Mr: Valdez identified several photographs that he took of the scene of the sexual assault approximately four months after the assault. He stated that three of the photographs showed a sleeping bag and wooden platform in the area of the assault. On cross-examination, Mr. Valdez admitted that the sleeping bag was the only item in the area that possibly showed that a homeless person stayed in there. He testified that he did not collect any of the items shown in the photographs because his job was only to photograph the scene.
The defendant did not testify at trial.
*1240 DISCUSSION

First Counseled Assignment of Error

By the first assignment of error, counsel contends that there was insufficient evidence to support the verdicts. Counsel argues that the evidence did not prove beyond a reasonable doubt that the defendant was the perpetrator. Counsel also | /¿appears- to argue that the evidence did not conclusively prove that the victim was raped.[1] We find no merit to these claims.
When reviewing a claim of insufficiency of evidence, the appropriate standard was set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979): the court must determine whether the evidence, viewed in the light most favorable to the prosecution, “was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.” State v. Captville, 448 So.2d 676, 678 (La.1984); see also State v. Brown, 2003-0897, p. 18 (La.4/12/05), 907 So.2d 1, 22; State v. Veal, 2012-0712, p. 17 (La.App. 4 Cir. 5/1/13), 116 So.3d 779, 790. If the State uses circumstantial evidence to prove the elements of the offense, “La. R.S. 15:438're-quires that ‘assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.’ ” State v. Neal, 2000-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657; see also, supra, Brown; Veal. A reviewing court must give - deference to the credibility determinations of the fact finder, and the court must not reweigh the evidence. State v. Jones, 2010-0018, p. 6 (La.App. 4 Cir. 11/10/10), 51 So.3d 827, 831.
While the defendant was charged with two counts of aggravated rape, the jury convicted him of two counts of attempted forcible rape. Aggravated rape which was defined at the time of the crime in pertinent part by La. R.S. 14:42:[2]
A.Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be 11fiwithout lawful consent of the victim because it is committed under any one or more of the following circumstances: ⅜ ⅜ ⅝
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
La. R.S. 14:41 defines rape:
A. Rape is the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person’s lawful consent.
B. Emission is not necessary, and any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime.
C. For purposes of this Subpart, “oral sexual intercourse” means the intentional engaging in any of the following acts with another person:
(1) The touching of the anus or genitals of the victim by the offender using the mouth or tongue of the offender.
(2) The touching of the anus or genitals of the offender by the victim using the mouth or tongue of the victim.
Forcible rape was defined by La. R.S. 14:42.1:
*1241 ■ A. Forcible rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.
11⅜(2) When the victim is incapable of resisting or of understanding the nature of the act by reason of stupor or abnormal condition of the mind produced by a narcotic or anesthetic agent or other controlled dangerous substance administered by the offender and without the knowledge of the victim.
An attempt is defined -in pertinent part by La. R.S. 14:27:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
B.(l) Mere ■ preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in.wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.
* * ⅜
C. An attempt is a separate but lesser grade of the intended crime; and any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was actually perpetrated by such person in pursuance of such attempt.
Lastly, as noted in State ex rel. Elaire v. Blackburn, 424 So.2d 246, 252 (La.1982), “when the defendant fails to interpose a timely objection to a legislatively responsive verdict, this court will not reverse the conviction if the jury returns such a verdict, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged.” See also State v. Graham, 1172014-1801 (La.10/14/15), 180 So.3d 271; State v. Pleasant, 2010-1538, p. 56 (La.App. 4 Cir. 5/18/11), 66 So.3d 51.
While the defendant hints that the evidence did not show that the victim was raped, the evidence adduced at trial supports the jury’s finding that two counts of attempted rape occurred. K.W. testified that .the perpetrator attempted to rape her both vaginally and anally, but he was not able to penetrate her very much. In addition, she testified that he placed his finger in her anus and her vagina. With respect to a second count of rape, the victim testified that the perpetrator ordered her to perform fellatio on him;: this action supported a finding that a second count of rape occurred. The rapes occurred while the. perpetrator was armed with a knife, thus satisfying the element of aggravated rape, with which the defendant was charged.
The defendant’s main claim with respect to sufficiency is tied to his assertion that the State failed to prove that he was the perpetrator of the sexual assault. As noted by this court in State v. Stewart, 2004-2219, p. 6 (La.App. 4 Cir. 6/29/05), 909 So.2d 636, 639, when a defendant disputes identity, “the State must negate any reasonable probability of misidentification in order to satisfy its burden under Jackson v. Virginia.” (citations omitted). Normally, when disputing identity, a defendant *1242 seeks to cast doubt on a physical identification, requiring a reviewing court to employ the five-part test for determining the reliability of .an identification set forth in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).' However, here the victim never, identified the defendant as the perpetrator; instead, he was identified through DNA. analysis of swabs taken from- the victim’s body.
hsDet, Henry testified that after--he received notification that the défendant’s DNA matched that in KW.’s samples, he attempted to; show* K.W. the defendant’s photograph, but she refused to look at it because she was so upset. At trial, K.W. never identified the,defendant as her assailant.. Ip addition, she was unable to complete a composite of her attacker. The defendant points to all of these factors, as well as his claim that the description given by -K.W. was vague and did not really match his, as support for his.claim that the State failed to prove his identity as the perpetrator..
Nonetheless, Ms- Hamilton testified that DNA evidence from a-swab taken' from KW.’s left buttock showed that K.W. could not be excluded as the major contributor of DNA and that the defendant could not be excluded as the minor contributor; Importantly, she concluded that it was 411 billion times more likely that the sample contained DNA that was a mixture of DNA from K.W. and the defendant than from K.W. and an unrelated random individual from the Caucasian population. With respect to the African-American population, it was 195 trillion times more likely to be from K.W. and the defendant than from K.W. and an unrelated random individual; the likelihood with respect to the Southwest Hispanic population was 54.0 trillion times more likely to be from K.W. and the defendant thap from K.W. and ap unrelated random individual.
The defendant points to the fact that Ms. Hamilton was unable.to find his DNA on K.W.’s genitalia or anus, nor was there any seminal' fluid in the swabs from those areas. He also points to the fact that there was only a small amount of DNA consistent with his on KW.’s buttocks, and he theorizes that his DNA could have been transferred to her when the perpetrator made her lie down on the wooden board while he attempted to rape her. However, Ms. Hamilton testified |19that any DNA evidence left on a wooden board as theorized by the defense would be subject to degradation or destruction by the elements. The defendant also points out that this DNA sample was negative for seminal fluid. .'However, K.W. testified that in addition .to trying to penetrate her, the perpetrator also kissed her buttocks. If his DNA -was deposited in this fashion, there would not have been any seminal fluid. Finally, he points to KW.’s failure to remember if the perpetrator was circumcised, even though she stated that .she placed her .left hand around his penis.
Nonetheless* none of these arguments disproves his identification as the perpetrator. The jurors were made aware of all of these arguments, arid they still found that the State proved that the defendant was the perpetrator. A fact finder’s credibility -determination is entitled to great weight and should not be disturbed unless it is. contrary to the evidence. State v. Meyers, 2011-1145, p. 8 (La.App. 4 Cir. 9/19/12), 100 So.3d 938, 943-44 (internal citations omitted); State v. Johnson, 2009-0259, p. 9 (La.App. 4 Cir. 9/16/09), 22 So.3d 205* 211, The defendant has made no showing that the jury’s finding is contrary to the evidepce. Despite the lack of any identification by the. victim, the State showed that it was between 411 billion to 195 trillion times more likely that the sample taken from KW.’s buttock contained DNA from. her and the defendant than *1243 from her and another unrelated random individual. •
While K.W. did not identify the defendant, thé DNA evidence adduced at trial was sufficient for the jury to reject the defendant’s theory that his DNA whs transferred,to her when she lay down on the wooden board. Thus, the State produced sufficient evidence for the jury to find beyond a reasonable doubt that the defendant was the perpetrator of the sexual assault, supporting its verdicts of guilty of two counts , of attempted forcible rape.
| ^Defendant's first counseled assignment of error is without merit.

Second Counseled Assignment of Error

By the second assignment of error, counsel contends that the trial court erred by allowing the State to introducé evidence of the defendant’s prior forcible rape conviction. Counsel argues that the only purpose of this evidence was to show the defendant’s bad character, and the probative value of its introduction was far outweighed by its prejudicial effect. Counsel asserts that the erroneous introduction of this evidence resulted in reversible error. Upon review, we find that the evidence was properly admitted at trial and we find no merit to this assignment of error.
The State introduced evidence of the defendant’s 1988 rape conviction pursuant to La. C.E. art. 412.2, which provides:
A, When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused’s commission of another crime, wrong, or act involving sexually assaultive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.
B. In a case in which the state intends to offer evidence under the provisions of this Article, the prosecution shall, upon request of the accused, provide reasonable notice in advance of trial of the nature of any such evidence it intends to introduce at trial for such purposes.
, C. This, Article shall not be construed to limit the admission or consideration of evidence under any other rule.
jjiThe Louisiana Supreme Court has held that a defendant is not entitled to a full-blown pretrial Prieur[3] hearing before the trial court can find evidence admissible under La. C.E. art 412.2. State v. Williams, 2002-0989, 2002-1030 (La.10/15/02), 830 So.2d 984;[4] - see also State v. Woodberry, 2014-0476, p. 14 (La. App. 4 Cir. 6/3/15), 171 So.3d 1082, 1091(“Article 412.2 was enacted to loosen restrictions on ‘other crimes’ evidence, and to allow evidence of ‘lustful disposition’ in cases involving sexual offenses.”).
La. C.E. art. 401 provides that evidence is relevant if it has' “any tendency to make the existence of any fhct that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” In addition, pursuant to La. C.E. art. 403, a court may exclude relevant evidence if its probative valué is “substantially outweighed , by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by *1244 considerations of undue delay, or waste of time.” As noted by this Court in State v. McElveen, “[a] trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect.” 2010-0172, p. 82 (La.App. 4 Cir. 9/28/11), 73 So.3d 1033, 1085, citing State v. Lambert, 98-0730, p. 22 (La.App. 4 Cir. 11/17/99), 749 So.2d 739, 755; see also Woodberry, 2014-0476, p. 14, 171 So.3d at 1091. Nonetheless, in State v. George, 2011-0325 (La.2/23/11), 55 So.3d 788, the trial court ruled that the State could not introduce evidence because the court found that its relevance was equal to its prejudicial value. The Supreme Court reversed, noting:
laaArticle 403, though, does not allow for the exclusion of relevant evidence if its probative value is equal to its prejudice. Instead, the evidence of defendant’s prior unadjudicated act of forcible rape should have been ruled inadmissible only if “its probative value is substantially outweighed by the danger of unfair prejudice.” Therefore, the trial judge abused her discretion by barring introduction of defendant’s prior unadju-dicated juyenile act of attempted forcible rape, [emphasis supplied]
Id., at p. 2, 55 So.3d at 789. Because the trial court did not find that prejudicial effect substantially outweighed its relevance, the Supreme Court found that the trial court abused its discretion by refusing to allow the State to introduce the evidence.
In the instant case, the State filed an art. 412.2 notice that indicated its intent to introduce evidence of the defendant’s 1988 forcible rape conviction. In response, the defendant filed a motion in limine to exclude this evidence, mostly based on an argument that its probative value would be greatly outweighed by its prejudicial effect. At the April 15, 2014 hearing on these pleadings, the defense argued that this evidence should not be admitted because the defendant never admitted his guilt, and this evidence was unduly prejudicial. The trial court rejected this argument and ruled that this evidence would be admissible at trial.
The defendant now argues that the trial court erred in its ruling. He asserts that this evidence is not admissible under art. 412.2, because the “lustful disposition” language of that article is applicable only to child victims, and K.W. was not a child. However, in State v. Wright, 2011-0141 (La.12/6/11), 79 So.3d 309, the Court specifically rejected the claim that art. 412.2 applies only to victims that are under the age of seventeen. Instead, the Court stated: “TJie statute | ^specifically applies in two situations: 1) when an accused is chargejl with a crime involving sexually assaultive behavior, or 2) when an accused is charged with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense.” Id., p. 11, 79 So.3d at 316 (emphasis added).
The defendant appears to confuse the introduction of this evidence under La. C.E. art. 412.2 with a similar statute, La. C.E. art. 404 B, which provides for the introduction of evidence of other crimes in ordei; to show a specified purpose, as described in State v. Prieur, .277 So.2d 126 (La.1973) and its progeny. The State’s notice, however, did not allege that it sought to introduces this evidence pursuant to art. 404 B; instead, it alleged that it was admissible under art. 412.2.
Lastly, the defendant argues that the evidence does not survive the balancing test of La.' C.E. art. 403. In support, he argues that the evidence adduced at trial was insufficient to show that he was the perpetrator of the present offenses, and the jury’s verdict was the result of V.H.’s identification of him in court as the *1245 man who raped her in 1988. However, the trial court found that the probative value of this evidence greatly outweighed its prejudicial effect. The defendant has not shown that the trial court abused its discretion in this finding. Indeed, as noted by this Court in State v. Cox, 2015-0124, pp. 11-12 (La.App. 4 Cir. 7/15/15), 174 So.3d 131,138:
All inculpatory evidence is “prejudicial” to a defendant, especially when it is “probative” to a high degree. State v. Rose, 06-0402, p. 13 (La.2/22/07), 949 So.2d 1236, 1244 (citing State v. Ger-main, 433 So.2d 110, 118 (La.1983)). The balancing test of La. C.E. art. 403 limits the introduction of probative evidence of prior misconduct “only when it is unduly and unfairly ^prejudicial.” Rose, supra. See also Old Chief v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997) (“The term ‘unfair prejudice,’ as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.”). The greater the degree of similarity of the offenses the more the evidence enhances the probability that the same person was the perpetrator, and hence the greater the probative value of the evidence, which ultimately is to be weighed against its prejudicial effect. Rose, 06-0402, p. 14, 949 So.2d at 1244.
Moreover, this Court has found similar evidence to be admissible under La. C.E. art. 412.2. In Woodberry, this Court found that evidence of a prior sexual assault committed by the defendant was admissible at his trial under La. C.E. art. 412.2 where the circumstances of the prior instance, while not identical to the present ones, were similar in that they were all committed within a small area of the city, and they all involved thé use of a gun to seize the victim and force her to a secluded spot, where the defendant raped the victims vaginally and anally. In Cox, this Court found evidence of sexual offenses with other juveniles in a different parish was admissible in the defendant’s trial.[5]
Here, the circumstances of the 1988 rape of V.H. were similar to those in the present case. In both cases, the victims were on a deserted street after dark. In both cases, the perpetrator came up behind the victim, put a knife to her, and forced her into a nearby secluded area where he raped her. In the 1988 rape, the defendant demanded money and then sex; in the present case, the perpetrator, whose DNA profile matched that of the defendant, stole the victim’s bus fare .prior to fleeing. Given the cases cited above, the defendant has not shown that the trial laiCourt abused its great. discretion by allowing the State to introduce at his present trial evidence of the 1988 rape for which he was convicted. This assignment of error is without merit.

Pro Se Assignment of Error

By his sole pro se assignment, the defendant contends that his counsel was ineffective for failing to file a written objection to the multiple bill as required by La. R.'S. 15:529.1 D(l). He asserts that by failing to do so, counsel was estopped from raising an objection as to the voluntariness of one of his predicate offenses. This assignment is without merit.
In addressing a claim of ineffective assistance of counsel, a reviewing court must determine if the defendant met the two- *1246 prong test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under this test, a defendant must show both that his counsel’s performance was deficient and that this deficiency-prejudiced him. See State v. Small, 2013-1384, p. 14 (La.App. 4 Cir. 8/27/14), 147 So.3d 1274, 1284[6]; State v. Turner, 2013-0285, p. 2 (La.App. 4 Cir. 12/4/13), 131 So.3d 106, 108; State v. Williams, 2006-1327, p. 30 (La.App. 4 Cir. 1/23/08), 977 So.2d 160, 177. A defendant must show that counsel made errors so serious that counsel “was not functioning as the ‘counsel’ guaranteed to the defendant by' the Sixth Amendment.” Turner, 2013-0285, pp. 2-3, 131 So.Sd at 108; see also State v. West, 2009-2810 (La.12/10/10), 50 So.3d 148. In order to show prejudice, the defendant must prove that the errors were so serious that he was deprived of a fair trial. “To carry his burden, the defendant ‘must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a | ¡^probability sufficient to undermine confidence in the outcome.’ ” Turner, 2013-0285, p. 3, 131 So.3d at 108, quoting Strickland, 466 U.S at 693, 104 5.Ct. at 2068. Moreover, as noted by this court in State v. Barnes, 2012-1283 pp. 18-19 (La.App, 4 Cir. 10/2/13), 126 So.3d 606, 617[7]:
“Hindsight is not the proper perspective for judging the competence of counsel’s trial decisions. Neither may an attorney’s level of representation be determined by whether a particular strategy is successful.” State v. Brooks, 505 So.2d 714, 724 (La.1987). If trial counsel’s actions fall “within the ambit of trial strategy,” they do not establish “ineffective assistance of counsel.” State v. Bienemy, 483 So.2d 1105, 1107 (La.App. 4th Cir.1986).
See also Jones v. Cain, 2014-0226 (La.App. 4 Cir. 10/8/14), 151 So.3d 781.[8]
Here, there is no indication that counsel filed a written objection to the multiple bill as contemplated by La. R.S. 15:529.1.' Nonetheless, the transcript of the April 16, 2015 multiple bill hearing shows that the trial court allowed counsel to argue the issue of the voluntariness of one of’the predicate offenses listed in the multiple bill. Counsel attempted to cross-examine the fingerprint expert about what was contained in the waiver form for that prior offense, but the trial court sustained the State’s objection to these questions because the expert’s testimony pertained only to the fingerprints and to the identification of the defendant. During argument on the multiple bill, counsel asserted that because the defendant had not checked on the waiver form that he wanted a jury or a judge trial, the defendant must not have been advised of this right.
The trial court correctly rejected this argument. Indeed, the multiple bill exhibits are in the appeal record, including the plea form to which counsel referred |27in his argument. The form advised the defendant that by pleading guilty, he waived, among other things, his right “[t]o a trial by either a judge or a jury and that further the right to a trial ’by judge extends until the first witness is sworn, and the right to a trial by a jury extends until the first juror is sworn, and if convicted the right to an appeal. Please specify: Judge trial or Jury Trial.” The defendant placed his initials next to this waiver, as well as *1247 next to the other rights he was waiving. At the bottom of the form, there is a note that states: “Defendant is to place his initials in the blocks provided for same. Defendant is to block out Judge Trial or Jury Trial as he applies [sic].”' Defense counsel pointed to the defendant’s failure to block out either judge trial or jury trial on the form.to support his theory that the defendant was not advised of his right to a trial by judge or jury.- However, the defendant initialed next to. the advisement that he had a right to a trial by judge or jury; the “note” is listed at the bottom of the form, below the signature lines for the judge, the defendant, and his counsel. The defendant makes no argument that he was not advised of this right, and indeed the form that he initialed and signed so advised him. Therefore, even if counsel had filed a written objection to the multiple Ml, this claim’ would have had no merit. Because the defendant cannot show any prejudice from counsel’s failure to file a written objection to the multiple bill, he cannot show that counsel was ineffective.
CONCLUSION
For the above stated reasons, defendant’s convictions and sentences are affirmed.
AFFIRMED
BONIN, J., concurs in the results.
DYSART, J., concurs in the results.

. Although originally charged with two counts of aggravated rape, defendant was found guilty of two counts of attempted forcible rape.

. La. R.S. 14:42 and 14:42.1-were amended in 2015 to change the names of the offenses from "aggravated rape” and “forcible rape” to "first degree rape” and “second degree rape.” The present offenses were committed prior to the amendments to the statutes.

. State v. Prieur, 277 So.2d 126 (La.1973).

. Art, 412.2 was enacted in 2001 in response to the Court’s ruling in State v. Kennedy, 2000-1554 (La.4/3/01), 803 So.2d 916, which held that evidence of other crimes was not admissible under La. C.E.'art. 804 to show a lustful disposition toward minors. See, State v. Layton, 2014-1910, p. 4 (La.3/17/15), 168 So.3d 358, 360.

. Also in State v. Brown, unpub. 2014-1110 (La.App. 4 Cir. 4/29/15), 2015 WL 2067283, the defendant was charged with indecent behavior with a juvenile, and this Court upheld the introduction of evidence that the defendant abused his sister-in-law and three of her friends when they were juveniles. .

. Writ denied, 2014-1930 (La.4/24/15), 169 So.3d 354.

. Writ denied, 2013-2598 (La.4/17/14), 138 So.3d 625.

.Writ denied, 2014-2148 (La.6/1/15), 171 So.3d 270.